[No. S052788. Feb. 2, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWIN WINSLOW BENNETT, Defendant and Appellant.

In re EDWIN WINSLOW BENNETT on Habeas Corpus.

**COUNSEL**

Martin Nebrida Buchanan, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens, Esteban Hernandez, Janelle Marie Boustany and Karl T. Terp, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KENNARD, J.**—Shortly after petitioner Edwin Winslow Bennett's arrest for murder, a law enforcement investigator asked the manager of the motel where petitioner was then living not to let anyone enter petitioner's room

without law enforcement authorization. The next day, the investigator entered the room and saw a .223-caliber rifle. Thereafter, the police obtained a warrant, searched the room, and seized the gun, which proved to be the murder weapon. At trial, petitioner's attorneys contended that the investigator's entry into petitioner's motel room was illegal, and that therefore the gun was inadmissible evidence. They did not, however, challenge the propriety of the investigator's request that the motel manager bar entry to petitioner's room. The trial court ruled that the gun was admissible, and a jury convicted petitioner of first degree murder (Pen. Code, § 187).

The Court of Appeal granted petitioner relief on habeas corpus and set aside his murder conviction. The court found petitioner's trial attorneys incompetent for not challenging the legality of the investigator's request that the motel manager deny others access to petitioner's room. We disagree, for a motion on this ground would not have been meritorious.

I

We begin by summarizing the evidence at petitioner's murder trial, at the hearing on the motion to suppress evidence filed by his trial attorneys, and in the habeas corpus proceedings initiated by his appellate counsel.

### A. *Evidence at Trial*

Prosecution witness Flora Larson testified that she met James Busher while he was on work furlough from federal prison, where he was serving a sentence for tax evasion. The two agreed to open a laundromat in Hesperia, a small town in San Bernardino County, California. Larson, who acted as Busher's chauffeur while he was on work furlough and in a halfway house, received $75,000 from Busher to invest in a laundromat, where Busher was to have a job after his release. In January 1988, Larson and Busher formed Swiftrail Corporation to build, own, and operate the Clean Fun Laundromat; Larson and Busher were the sole shareholders and officers. The next month, Busher was released from the halfway house.

The laundromat opened for business in September 1988. By the end of 1988, Larson and Busher were not on speaking terms. Larson replaced Busher on the corporation's board of directors with two members of her own family.

In February 1989, Larson became romantically involved with petitioner, who moved into Larson's house and began working at the laundromat. The next month, Larson signed a document giving petitioner authority to act on

behalf of Swiftrail Corporation. Busher wrote petitioner a letter stating that petitioner did not have Busher's permission to represent or work on behalf of Swiftrail and asking him to cease such activities.

In April 1989, Busher filed a lawsuit seeking to gain control over Swiftrail Corporation. On April 18, 1989, the trial court in that action appointed a receiver to run the corporation. That evening, petitioner told Larson to drive him to an Orange County residential area, which Larson did not recognize until they arrived at the trailer park where Busher lived. Petitioner then pulled out a rifle and told Larson to park the car with the lights out. When Larson asked what he was doing, petitioner told her to be quiet and threatened to kill her. They waited until 2:30 or 3:00 a.m., when Busher drove up. Petitioner told Larson to start driving; when she "froze," petitioner put the car in gear. Larson drove slowly past Busher while petitioner fired, killing him. Busher had five bullet wounds in his body. Police found nine expended .223-caliber casings at the scene.

Petitioner and Larson continued to live together, but their relationship deteriorated. Once, Larson's mother was present when the two were arguing. When Larson's mother intervened to stop petitioner from choking Larson, petitioner told Larson, "I can have the same thing done to you . . . that I had done to Jim Busher." On two occasions, petitioner admitted to Larson's fifteen-year-old son, Gary, that he had killed Busher.

In September 1989, petitioner moved out of Larson's home and took a room at the EZ-8 Motel in Victorville, an unincorporated area of San Bernardino County not far from Hesperia, where Larson had the laundromat. On September 27, 1989, the police arrested him at the laundromat for the murder of Busher. As mentioned at the outset, the police found a .223-caliber rifle in his motel room. A criminalist for the Orange County Sheriff's Department testified that the shell casings found at the murder scene were fired from the rifle.

While in jail, petitioner prepared a letter addressed to the Orange County District Attorney, purporting to be from a "Mr. T." The letter said that Mr. T. and his cousin had killed Busher, and that petitioner and Larson were innocent. Petitioner offered $1,000 to Gary Lyles, an inmate who was about to be released, to copy the letter and to mail it from Riverside County.

Petitioner testified in his own defense, denying that he had killed Busher. He claimed that on the night of the murder he was at the home of his friends Michael and Carmen Leonard, drinking beer and using amphetamines, from 10:00 or 11:00 at night until about 4:30 the next morning, when he went

home. Larson was not there when he arrived. At 6:30 or 7:00 a.m., Larson telephoned and said that Busher had been shot. Petitioner returned to the Leonards' home later that morning and mentioned the shooting.

Petitioner denied telling Larson in front of her mother that he could have "the same thing" done to her that he had done to Busher. He said that on one occasion he found Larson's son Gary crying because Gary had overheard his mother saying that she "took care of" Busher. Not wanting Gary to think his mother was a murderer, petitioner falsely told Gary that petitioner had Busher killed. According to petitioner, the rifle in his motel room was a gift from Larson.

Michael Leonard testified that on some unspecified date after April 14, 1989, petitioner came to his home and stayed until about 4:00 a.m., drinking beer and using amphetamines. Petitioner returned the next morning, saying that an acquaintance of his had been shot. Michael's wife Carmen corroborated Michael's testimony.

The jury convicted petitioner of first degree murder.

B. *Petitioner's Motion to Suppress Evidence*

Before trial, the attorneys representing petitioner, Deputy Public Defenders Leonard Gumlia and James Barnett, filed a motion under Penal Code section 1538.5 to suppress the rifle (later identified at trial as the murder weapon) that police had seized from petitioner's motel room, on the ground that the warrant authorizing the search of petitioner's room was a product of an earlier illegal search of the room.[1] Midway through the suppression hearing before Judge Ronald Owen, the public defender's office declared a conflict of interest. William Morrissey was appointed to represent petitioner, and the matter was transferred to Judge Richard Weatherspoon. Attorney Morrissey filed no additional points and authorities in support of the suppression motion; the parties stipulated that Judge Weatherspoon could decide the motion based on the testimony that had been presented before Judge Owen and on additional testimony taken before Judge Weatherspoon. A summary of this testimony follows.

On the afternoon of September 27, 1989, San Bernardino Deputy District Attorney Terry Barnes telephoned District Attorney Investigator Brian Moore. Barnes told Moore that Santa Ana police officers had arrested

---

[1]The defense also argued that the warrant authorizing the search of petitioner's room was invalid on two other theories: that the warrant affidavit did not establish probable cause, and that material facts were recklessly or intentionally omitted from the warrant affidavit.

petitioner for murder, and that petitioner had been staying at the EZ-8 Motel in Victorville. Investigator Moore then called Santa Ana Police Officer Gary Mata, who was working on the case, and mentioned petitioner's stay in Victorville. Moore also called the EZ-8 Motel and spoke to the manager, Louise Proctor. Proctor confirmed that petitioner had been staying at the motel, and said that he was entitled to use the room until checkout time at 11:00 the next morning, September 28. Moore told Proctor that petitioner had been arrested and would not be returning to the motel, and he asked her not to let anyone into the room without law enforcement permission. Moore reported this conversation to Officer Mata. Motel manager Proctor, meanwhile, put a "cuff" lock on the door to petitioner's room to prevent unauthorized entry.

That night and again the next morning, petitioner's father came to the EZ-8 Motel and attempted to retrieve petitioner's belongings. On each occasion, motel manager Proctor told him that only the police were permitted to enter petitioner's room. That morning, between 9:00 and 9:30, Proctor reported these events to investigator Moore and asked him what she should do with the room.

Moore then called Officer Mata. Accounts of this conversation differ. According to investigator Moore, Officer Mata asked him to search petitioner's room at 11:00 a.m., the motel's checkout time, and to look for shell casings, weapons, and "anything out of the ordinary." Officer Mata, by contrast, testified that it was his understanding that a maid would enter petitioner's room at 11:00 a.m. and pick up petitioner's belongings, and that he told Moore to stand just outside the room while the maid entered and to try to "see something." Mata explained that the officer heading the investigation of petitioner's case was out of town, that he (Mata) was not familiar with all of the investigation that had been done, and that he was reviewing police reports in the case to determine whether there was probable cause to obtain a search warrant for petitioner's motel room.

Investigator Moore testified that at 10:00 a.m., an hour before the motel's checkout time, he entered petitioner's room and saw a gun case next to the bed. He partially unzipped the case and saw the butt section of a rifle. He then left, locked the room, called Officer Mata, and told him what he had found.

According to Officer Mata, when he received Moore's telephone call he was still reviewing petitioner's case and had not yet decided whether to obtain a search warrant. After completing his review, he concluded there was probable cause to search the room, and he prepared an affidavit in support of a search warrant. Because he believed that Moore might have acted illegally in searching the room, he did not mention the search in the affidavit. The

affidavit stated that on September 27, 1989 (the day before the affidavit was prepared), a Santa Ana police investigator spoke with Flora Larson, petitioner's former girlfriend. Larson told the investigator that petitioner had said on several occasions that he had killed victim Busher, that he had "dug up" the gun he had used to kill Busher, and that he planned to use the gun to kill Larson. The affidavit further stated that Officer Mata had "received information" that petitioner "has recently been seen in possession of a rifle"; it did not identify the source of this information and the record contains no evidence that this statement was based on Moore's entry into petitioner's motel room. Mata obtained a warrant later that day and searched the room, recovering the rifle.

In its points and authorities supporting the motion to suppress the rifle found in petitioner's motel room, the defense contended that investigator Moore had unlawfully entered the room, that Officer Mata's decision to seek a search warrant was prompted by Moore's observation of the rifle while he was in the room, and that the subsequent seizure of the rifle during the warrant-authorized search of the room was illegal because it was a "fruit" of Moore's illegal entry. (See *Murray* v. *United States* (1988) 487 U.S. 533, 542-543 [108 S.Ct. 2529, 2535-2536, 101 L.Ed.2d 472].) The trial court disagreed and denied the suppression motion. The court found it "inconceivable that the investigators in this case would not have sought a search warrant for the room of the murder suspect in their custody," and ruled that the rifle was admissible evidence because it would inevitably have been discovered even if investigator Moore had not made the entry in question.

## C. *Proceedings on Appeal and on Habeas Corpus*

After his conviction of first degree murder, petitioner appealed. Simultaneously, he filed a petition for writ of habeas corpus in the Court of Appeal, asserting that his attorneys were incompetent for not arguing at the suppression hearing that, in asking motel manager Proctor not to let anyone enter petitioner's motel room without police permission, investigator Moore unlawfully "seized" the room. The later seizure of the gun by the police acting under authority of a search warrant was, according to petitioner, a "fruit" of the initial seizure of the motel room.[2] The Court of Appeal issued an order to show cause returnable before the Orange County Superior Court, and it

---

[2]The petition contained declarations from Deputy Public Defender Gumlia and Attorney Morrissey, who, as previously explained, represented petitioner during the suppression hearing. Deputy Public Defender Gumlia stated that he had learned of the "seizure" of petitioner's room for the first time on the day of the hearing on the suppression motion, and that he had intended to file supplemental points and authorities raising the issue but did not do so because his office declared a conflict of interest. Attorney Morrissey, who represented petitioner after the public defender's office was relieved, declared that he had not raised the issue because he concluded that it lacked merit.

ordered that the appeal be held in abeyance pending the outcome of the hearing on the order to show cause.

In the return to the order to show cause, the People, represented by the Orange County District Attorney, made a general denial. At the subsequent hearing in the superior court, the prosecution offered no additional evidence. The parties appear to have stipulated that the case could be decided based on the record of the suppression hearing and on the habeas corpus petition, return, and traverse, as well as the exhibits attached thereto. After reading these documents and hearing oral argument, Judge David Carter of the Orange County Superior Court denied the habeas corpus petition, concluding that if petitioner's trial counsel had moved to suppress the rifle on the basis that the police illegally seized petitioner's room when investigator Moore asked motel manager Proctor not to permit anyone to enter it, the motion would have been denied on the ground of inevitable discovery.

Petitioner then filed a second habeas corpus petition in the Court of Appeal, raising the same claim he had raised in his initial petition. The Court of Appeal consolidated this petition with the direct appeal and issued another order to show cause. The Attorney General filed a return to the order to show cause and petitioner filed a traverse; each relied on the record established in the proceedings related to petitioner's previous habeas corpus petition.

The Court of Appeal granted this petition, set aside the conviction, and dismissed the appeal as moot. It held that the cuff lock that motel manager Proctor had placed on the door to petitioner's motel room, in response to investigator Moore's request not to allow unauthorized entry, constituted an unlawful seizure of the room and that petitioner's trial attorneys were incompetent for not moving to suppress the rifle found in the room as the tainted fruit of this illegal seizure. The court reasoned: "This motel room was seized without the intention of obtaining a warrant by the lead investigator until an investigator from another jurisdiction made a patently illegal search. The seizure of the room (via the cuff lock) was unlawful and the rifle and the other contents of the room and their fruits must be suppressed."

The Court of Appeal rejected the trial court findings by Judges Carter and Weatherspoon that the evidence would inevitably have been discovered. It explained: "There was but an hour to go on the tenancy of the motel room when [Officer Mata] decided to begin the process of obtaining a warrant for fear that Moore had completely compromised the discovery of the rifle. The room had already been seized by Moore and Mata for some 18 hours. Mata's instructions to Moore had been quite clear: Search after the tenancy expired or await the gleanings of the maid from the room. By the morning of the 28th, the warrant, which could not possibly have arrived before the tenancy had expired, was a pure afterthought. This court is not bound by 'factual

findings' of a lower court that are not supported by the record." The failure of petitioner's attorneys to challenge the legality of investigator Moore's seizure of petitioner's motel room, the Court of Appeal concluded, violated petitioner's right to effective representation by counsel.

We granted the Attorney General's petition for review.

## II

■ A criminal defendant's right to competent counsel—" 'the reasonably competent assistance of an attorney acting as [a] diligent conscientious advocate' "—is guaranteed by the Sixth Amendment to the United States Constitution and by article I, section 15, of the California Constitution. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839].) ■ A claim that a defendant's trial attorney was ineffective for failing to move to suppress illegally obtained evidence is cognizable on habeas corpus. (See *People* v. *Mendoza Tello* (1997) 15 Cal.4th 264 [62 Cal.Rptr.2d 437, 933 P.2d 1134]; *In re Wilson* (1992) 3 Cal.4th 945 [13 Cal.Rptr.2d 269, 838 P.2d 1222].) To obtain relief, a petitioner must show that "(1) counsel's representation was deficient in falling below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation subjected the petitioner to prejudice, [that is], there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the petitioner." (*In re Wilson, supra*, at p. 950.)

As mentioned earlier, the Court of Appeal held that investigator Moore illegally seized petitioner's motel room when, after petitioner's arrest, Moore asked motel manager Proctor not to let anyone enter it without police permission; that the murder weapon later found in the room was a "fruit" of this unlawful seizure; and that petitioner's trial attorneys were incompetent for not moving to suppress the rifle on this ground. The Attorney General does not dispute that investigator Moore's request constituted a seizure.[3] He contends, however, that the seizure did not violate the Fourth Amendment; that the subsequent seizure of the rifle under a valid search warrant was an "independent source" that dissipated the taint of any illegality; and that even if a motion to suppress the rifle would have been meritorious, defense counsel's failure to make such a motion was harmless in light of the overwhelming evidence of petitioner's guilt.

---

[3]Nor does the Attorney General dispute that although it was motel manager Proctor rather than investigator Moore who denied unauthorized persons access to petitioner's room, Proctor was acting as a law enforcement agent when she placed the cuff lock on the door, as this action was in response to Moore's request that Proctor bar unauthorized entry into petitioner's room. (See generally, *United States* v. *Reed* (9th Cir. 1994) 15 F.3d 928 [motel owner who searched room acted as agent of police].)

We agree with the Attorney General that a motion to suppress the rifle based on Moore's seizure of the room would have been unmeritorious, and that therefore petitioner's trial attorneys were not incompetent for not raising this theory in their suppression motion, as we explain below.

### III

■ Did investigator Moore illegally seize petitioner's motel room when he told motel manager Proctor not to let anyone enter the room without law enforcement permission? As far as we know, there is no published decision addressing the circumstances under which the police may seize a residence *without* entering it, as occurred here. There is, however, case law explaining when the police may enter and seize a residence, as discussed below.

■ "[A] warrantless entry by the police into a residence is at least presumptively unreasonable and therefore unlawful." (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1297 [248 Cal.Rptr. 834, 756 P.2d 221].) As the United States Supreme Court has explained: "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." (*Payton* v. *New York* (1980) 445 U.S. 573, 590 [100 S.Ct. 1371, 1382, 63 L.Ed.2d 639].) The constitutional protection afforded to the homeowner applies with equal force to a guest in a hotel room. (*Stoner* v. *California* (1964) 376 U.S. 483, 490 [84 S.Ct. 889, 893-894, 11 L.Ed.2d 856].)

Neither the United States Supreme Court nor this court has delineated the circumstances under which a police officer who fears destruction or removal of evidence within a dwelling place before a search warrant can be obtained may enter the premises, thereby "securing" them. There are, however, a number of appellate decisions by California and federal courts holding that the police may do so only if there is probable cause to believe that contraband or evidence of a crime is on the premises and there are "exigent circumstances" justifying the warrantless or prewarrant entry. (*People* v. *Gentry* (1992) 7 Cal.App.4th 1255, 1261 [9 Cal.Rptr.2d 742]; *People* v. *Camilleri* (1990) 220 Cal.App.3d 1199, 1209 [269 Cal.Rptr. 862]; *People* v. *Koch* (1989) 209 Cal.App.3d 770, 782 [257 Cal.Rptr. 483]; *U.S.* v. *Tovar-Rico* (11th Cir. 1995) 61 F.3d 1529, 1534-1535; *U.S.* v. *Rico* (5th Cir. 1995) 51 F.3d 495, 500-501; *U.S.* v. *Lindsey* (9th Cir. 1989) 877 F.2d 777, 780; *U.S.* v. *Sangineto-Miranda* (6th Cir. 1990) 859 F.2d 1501, 1511; *U.S.* v. *Socey* (D.C. Cir. 1988) 846 F.2d 1439, 1444 [269 App.D.C. 453]; *United States* v. *Roselli* (7th Cir. 1974) 506 F.2d 627, 628-629; *United States* v. *Rubin* (3d Cir. 1973) 474 F.2d 262, 268-269.)

■ Most of these decisions have followed the reasoning of the federal court of appeals in *United States* v. *Rubin, supra,* 474 F.2d at pages 268-269: "When Government agents . . . have probable cause to believe contraband is present and, in addition, based on the surrounding circumstances or the information at hand, they reasonably conclude that the evidence will be destroyed or removed before they can secure a search warrant, a warrantless search is justified. The emergency circumstances will vary from case to case, and the inherent necessities of the situation at the time must be scrutinized. Circumstances which have seemed relevant to courts include (1) the degree of urgency involved and the amount of time necessary to obtain a warrant [citations]; (2) reasonable belief that the contraband is about to be removed [citations]; (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought [citation]; (4) information indicating the possessors of the contraband are aware that the police are on their trail [citation]; and (5) the ready destructibility of the contraband and the knowledge 'that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic' [citations]."

Petitioner here argues there were no exigent circumstances when investigator Moore "seized" his motel room by requesting that the motel manager not let anyone into the room without police permission. Petitioner states that when Moore seized the room, Officer Mata had not yet decided whether to seek a warrant to search the room and that it was not until the next morning that Mata began reviewing the case to determine whether a warrant could be obtained. As the Attorney General points out, however, the police "secured" petitioner's motel room *not by entering,* which would have impaired petitioner's privacy interests, but by *preventing others* from entering.[4] We agree that this is a significant circumstance, which distinguishes it from the cases cited on page 384, *ante.*

■ Under the Fourth Amendment, a seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." (*United States* v. *Jacobsen* (1984) 466 U.S. 109, 113 [104 S.Ct. 1652, 1656, 80 L.Ed.2d 85].) The ultimate measure of the constitutionality of a seizure is reasonableness. (*Soldal* v. *Cook County* (1992) 506 U.S. 56, 71 [113 S.Ct. 538, 548-549, 121 L.Ed.2d 450].)

---

[4] Although investigator Moore entered petitioner's motel room the day after he "seized" it, the legality of that entry is not at issue here. As previously explained, petitioner's trial attorneys challenged the legality of Moore's entry into the room, and the trial court rejected that challenge. The propriety of the trial court's ruling on that issue may be addressed on appeal. The only issue before us in this habeas corpus proceeding is whether petitioner's attorneys should have moved to suppress the murder weapon on the separate ground that Moore illegally seized petitioner's room when he told motel manager Proctor not to let anyone enter it without police permission.

Generally, the reasonableness of a seizure is judged by balancing the intrusion on the individual's Fourth Amendment interests against the promotion of legitimate governmental interests. (*Tennessee* v. *Garner* (1985) 471 U.S. 1, 8 [105 S.Ct. 1694, 1699-1700, 85 L.Ed.2d 1]; *United States* v. *Place* (1983) 462 U.S. 696, 703 [103 S.Ct. 2637, 2642-2643, 77 L.Ed.2d 110].) The first factor to be considered in determining reasonableness is the nature of the Fourth Amendment interest on which the seizure intrudes. (*Vernonia School Dist. 47J* v. *Acton* (1995) 515 U.S. 646, 654 [115 S.Ct. 2386, 2391, 132 L.Ed.2d 564].) Fourth Amendment restrictions on seizures of property generally protect both possessory interests and privacy interests. (*Soldal* v. *Cook County, supra,* at pp. 62-65 [113 S.Ct. at pp. 543-545].) "When 'operational necessities' exist, seizures can be justified on less than probable cause." (*Id.* at p. 66, fn. 9 [113 S.Ct. at p. 546].)

When police officers *enter* a dwelling without the consent of its occupant, they necessarily impinge upon the occupant's privacy expectations. For this reason, courts have held that the police may not enter a dwelling to "secure" the evidence therein without both probable cause and exigent circumstances. (See cases cited at p. 384, *ante.*) When, as here, police officers *remain outside* a dwelling, the Fourth Amendment rights implicated are ordinarily not the occupant's privacy interests, but rather the occupant's possessory interests in the dwelling and its contents. Although the seizure is subject to Fourth Amendment scrutiny, the police officers themselves have not, in the words of the high court, crossed the "firm line at the entrance to the house" that the Fourth Amendment has drawn. (*Payton* v. *New York, supra,* 445 U.S. at p. 590 [100 S.Ct. at p. 1382].) And when, as here, the dwelling's only occupant has been validly arrested away from the dwelling, the interference with possessory interests is attenuated. Because the occupant is already in custody, the seizure of the dwelling does not prevent the occupant from entering it. The seizure only prevents other persons authorized by the occupant from entering the premises in question.

To determine the legality of investigator Moore's temporary seizure of petitioner's motel room, we look to the rules governing the circumstances under which police may detain a suspect for investigation. Such a detention is a "seizure" within the meaning of the Fourth Amendment (*Florida* v. *Royer* (1983) 460 U.S. 491, 498 [103 S.Ct. 1319, 1324, 75 L.Ed.2d 229]; *People* v. *Glaser* (1995) 11 Cal.4th 354, 363 [45 Cal.Rptr.2d 425, 902 P.2d 729]); here, as we explained earlier, investigator Moore seized petitioner's motel room when he told the motel manager not to let anyone into the room without police permission (see *United States* v. *Jacobsen, supra,* 466 U.S. at p. 113 [104 S.Ct. at p. 1656]).

Although police officers may not arrest or search a suspect without probable cause and an exception to the warrant requirement, they may

temporarily detain a suspect based only on a "reasonable suspicion" that the suspect has committed or is about to commit a crime. (*Alabama* v. *White* (1990) 496 U.S. 325, 327-328 [110 S.Ct. 2412, 2414-2415, 110 L.Ed.2d 301]; *Brown* v. *Texas* (1979) 443 U.S. 47, 51 [99 S.Ct. 2637, 2640-2641, 61 L.Ed.2d 357].) Such detentions are permitted, notwithstanding the Fourth Amendment's requirements of probable cause and a search warrant, because they are "limited intrusions" that are "justified by special law enforcement interests." (*Michigan* v. *Summers* (1981) 452 U.S. 692, 700 [101 S.Ct. 2587, 2593, 69 L.Ed.2d 340]; see also *United States* v. *Place, supra,* 462 U.S. at p. 703 [103 S.Ct. at p. 2642] ["When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause."].) Similarly, if police officers have a "reasonable suspicion" that contraband or evidence of a crime is present in a dwelling, we see no valid reason why the officers, while remaining outside the dwelling, may not, to prevent tampering or destruction of evidence, prohibit entry into the dwelling for a reasonable period of time, until they can determine through their investigations whether to seek a search warrant.

As the United States Supreme Court has explained, reasonable suspicion is "something more than an 'inchoate and unparticularized suspicion or "hunch,"'" (*United States* v. *Sokolow* (1989) 490 U.S. 1, 7 [109 S.Ct. 1581, 1585, 104 L.Ed.2d 1]), but something less than probable cause, which has been described as "'a fair probability that contraband or evidence of a crime will be found'" (*ibid.*). In the words of the high court: "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. . . . Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors— quantity and quality—are considered in the 'totality of the circumstances— the whole picture,' [citation], that must be taken into account when evaluating whether there is reasonable suspicion." (*Alabama* v. *White, supra,* 496 U.S. at p. 330 [110 S.Ct. at p. 2416].)

Permitting police officers the "limited intrusion" (*Michigan* v. *Summers, supra,* 452 U.S. at p. 700 [101 S.Ct. at p. 2593]) of temporarily prohibiting entry to a dwelling when they have a reasonable suspicion that contraband or evidence of a crime is inside, while the officers themselves remain outside, will enable them to carry out their investigations free from the fear that such evidence or contraband will be destroyed. At the same time, it may prevent

a greater intrusion, such as a warrantless entry and search of the dwelling. The policy of the Fourth Amendment is to prevent the government from unnecessarily intruding on an individual's privacy rights. If police officers have a "middle ground" of barring entry to a suspect's dwelling for a limited period during their investigations, while the officers remain outside the premises, the investigations may reveal that a search of the dwelling is unnecessary, thus minimizing the intrusion on the occupant's Fourth Amendment interests. If, on the other hand, the investigating officers conclude that a search of the dwelling is called for, permitting the officers to bar entry will give the officers sufficient time to seek a warrant, thereby allowing a neutral and detached magistrate to determine whether the officers have probable cause to search.

Our conclusion seeks to minimize the intrusion on the individual's Fourth Amendment interests, while at the same time recognizing that the "operational necessities" of police investigation justify a limited and temporary form of seizure based on less than probable cause. (See *Soldal* v. *Cook County, supra,* 506 U.S. at p. 66, fn. 9 [113 S.Ct. at p. 546].)

█ In this case the police, having been told by Flora Larson that petitioner had shot and killed victim James Busher, and having just arrested petitioner for murder, learned that petitioner was registered at a certain motel. Under these circumstances, it was not unreasonable for the police to suspect that evidence of the murder might be found in petitioner's motel room. Thus, the police did not act illegally by temporarily prohibiting unauthorized entry into the room until they could determine whether to apply for a warrant to search the room.

We do not decide here the outer limits of the period during which police officers may bar entrance to a dwelling, thereby "seizing" it. The police may detain a *suspect* for investigation only for relatively brief periods of time. (See *United States* v. *Place, supra,* 462 U.S. at pp. 709-710 [103 S.Ct. at pp. 2645-2646] [detention lasting 90 minutes was impermissibly long].) But temporarily seizing a person and depriving him or her of freedom of movement imposes a far greater intrusion on Fourth Amendment interests than occurs when police temporarily seize a dwelling. Here, as we have explained, the intrusion on petitioner's Fourth Amendment interests was particularly minimal because he had already been legally arrested at a place away from his motel room, and his possessory rights to that room were impaired only to the extent that the police prevented other persons from entering it. As a result, it was reasonable for the police to seize his room for the 18 hours necessary to complete their investigation. Whether police officers may seize the dwellings of persons not in custody for a comparable period of time is a question we need not decide here.

## IV

Even if we were to assume that investigator Moore illegally seized petitioner's motel room when he told motel manager Proctor not to let anyone enter it without law enforcement permission, the rifle found in the room was not the "fruit" of that seizure and therefore need not have been suppressed, because after the entry the police utilized an "independent source" to seize the rifle: a search warrant issued on the basis of facts unrelated to Moore's conduct.

On point here is the high court's decision in *Segura* v. *United States* (1984) 468 U.S. 796 [104 S.Ct. 3380, 82 L.Ed.2d 599]. In that case, police legally arrested and searched two suspects, finding a large quantity of cocaine. The suspects told the police that they had bought the cocaine from the defendant. When an assistant United States attorney told the police that a warrant to search the defendant's apartment could not be obtained until the next day, the police arrested the defendant, entered his apartment (observing drug paraphernalia), and remained there for 19 hours until a magistrate issued a search warrant. The police then searched the apartment, finding drugs. The warrant affidavit did not mention that the police had entered the defendant's apartment and observed drug paraphernalia.

The United States Supreme Court held that regardless of whether the police officers had unlawfully seized defendant Segura's apartment when they entered it without a warrant, the drugs seized in the ensuing search pursuant to a warrant need not be suppressed because "there was an independent source for the warrant under which that evidence was seized." (*Segura* v. *United States, supra,* 468 U.S. at p. 814 [104 S.Ct. at p. 3390].) Because "[n]one of the information on which the warrant was secured was derived from or related in any way to the initial entry," the court said, the search warrant was "a 'means sufficiently distinguishable' to purge the evidence of any 'taint' arising from the entry." (*Ibid.*)[5]

The majority in *Segura* rejected the dissent's argument that the initial entry tainted the later search because someone might have removed or

---

[5]In *People* v. *Shuey* (1975) 13 Cal.3d 835 [120 Cal.Rptr. 83, 533 P.2d 211] (*Shuey II*), police officers illegally entered the defendants' home and arrested them. The police thereafter obtained a warrant and searched the house, finding drugs. This court held that the warrant could not "disinfect" the initial illegal occupation of the house. (*Id.* at p. 850; see also *Shuey* v. *Superior Court* (1973) 30 Cal.App.3d 535 [106 Cal.Rptr. 452] (*Shuey I*).) To the extent that *Shuey II* holds that a subsequent search warrant may *never* "disinfect" a previous illegal entry or search, that view has been rejected by the high court's decision in *Segura* v. *United States, supra,* 468 U.S. 796.

Our decision in *Shuey II, supra,* 13 Cal.3d 835, does not reveal the contents of the warrant affidavit prepared by the officers. The officers' affidavit may well have been based on

destroyed the drugs before a search warrant could be obtained if the police had not initially entered the defendant's apartment. The majority held that the "independent source" doctrine nevertheless applied: "It may be that, if the agents had not entered the apartment, [the defendants] might have arranged for the removal or destruction of the evidence, and that in this sense the agents' actions could be considered the 'but for' cause for discovery of this evidence. But at this juncture, we are reminded of Justice Frankfurter's warning that '[s]ophisticated argument may prove a causal connection between information obtained through [illegal conduct] and the Government's proof,' and his admonition that the courts should consider whether '[a]s a matter of good sense . . . such connection may have become so attenuated as to dissipate the taint.' [Citation.] The essence of the dissent is that there is some 'constitutional right' to destroy evidence. This concept defies both logic and common sense." (*Segura* v. *United States, supra*, 468 U.S. at p. 816 [104 S.Ct. at p. 3391].)

When the admissibility of evidence is challenged as being the "fruit" of an unlawful search and seizure, article I, section 28, subdivision (d) of the California Constitution requires us to follow the decisions of the United States Supreme Court. (*People* v. *Souza* (1994) 9 Cal.4th 224, 232 [36 Cal.Rptr.2d 569, 885 P.2d 982]; *In re Lance W.* (1985) 37 Cal.3d 873, 885-890 [210 Cal.Rptr. 631, 694 P.2d 744].) Thus, the high court's decision in *Segura* v. *United States, supra*, 468 U.S. 796, is dispositive here.

As in *Segura* v. *United States, supra*, 468 U.S. 796, the police here seized evidence while acting under the authority of a valid search warrant based on an affidavit that did not mention investigator Moore's allegedly illegal seizure of petitioner's room. Rather, the affidavit established probable cause to search based on information unrelated to Moore's seizure of the room: petitioner's former girlfriend, Flora Larson, who told police that petitioner had "dug up" the rifle with which he had killed Busher and that he threatened to use it to kill her too. The police officers, who at this time were apparently unaware that Larson had been involved in the shooting of Busher, could reasonably believe that Larson was a citizen informant whose information could be considered reliable (*People* v. *Ramey* (1976) 16 Cal.3d 263, 269 [127 Cal.Rptr. 629, 545 P.2d 1333]); her information was corroborated

---

evidence discovered during the illegal police occupation of the defendant's room. Also, the "independent source" doctrine would be inapplicable if the unlawful entry led to the officers' decision in *Shuey II* to seek the search warrant, even if the entry was not mentioned in the affidavit. (*Murray* v. *United States, supra*, 487 U.S. 533, 542-543 [108 S.Ct. 2529, 2535-2536].) Thus, to the extent that *Shuey II* merely holds that under the facts in that case the search warrant did not dissipate the taint of the initial illegal entry, we have no basis to question its soundness.

to some degree by the fact that, according to the warrant affidavit, defendant had recently been seen in possession of a gun. If, as Larson told the police, defendant was still in possession of the gun he had used to kill Busher, most likely the murder weapon would be in the motel room where he was staying. These facts demonstrated probable cause to search defendant's motel room because, under the "totality of the circumstances," they established a "fair probability that contraband or evidence of a crime" would be found in the room. (*Illinois* v. *Gates* (1983) 462 U.S. 213, 238 [103 S.Ct. 2317, 2332, 76 L.Ed.2d 527].) As in *Segura*, therefore, the warrant here was sufficient to dissipate the taint of any illegality.

It may well be that, as petitioner argues, if investigator Moore had not told the motel manager not to let anyone into petitioner's motel room without police permission, petitioner's father or someone else authorized by petitioner to gather his belongings from the room would have removed the rifle, thereby preventing the police from finding it. But under *Segura* v. *United States, supra,* 468 U.S. 796, as discussed above, that possibility is irrelevant to the applicability of the "independent source" doctrine.

Petitioner also contends that if investigator Moore had not entered petitioner's motel room and seen the rifle, the police would never have sought a search warrant and the gun would not have been seized. The Court of Appeal used that same reasoning when it granted petitioner's second petition for a writ of habeas corpus. We consider it highly unlikely that the police would not have sought a warrant, if one was necessary, to search the room of a suspect just arrested for murder.[6] In any event, the question whether the police would have tried to obtain a warrant has no bearing on the outcome of this habeas corpus proceeding. Investigator Moore's observation of the rifle was not the result of the "seizure" that occurred when he asked motel manager Proctor not to let anyone into petitioner's room without police permission. Rather, that observation resulted from Moore's entry into petitioner's room the next day. Because petitioner's trial attorneys challenged the legality of that entry, it is not an issue here, where the sole question is

---

[6]Petitioner asserts that the police officers might not have sought a search warrant because they could have searched his property without a warrant after 11:00 a.m., when his tenancy in the motel room expired. It is unclear, however, whether such a warrantless search would have been permissible. Ordinarily, a suspect has no expectation of privacy with regard to items left in a motel room after a tenancy has expired, and the police may search such items with the consent of the owner of the motel. (*Abel* v. *United States* (1960) 362 U.S. 217, 241 [80 S.Ct. 683, 698, 4 L.Ed.2d 668]; *United States* v. *Ramirez* (5th Cir. 1987) 810 F.2d 1338, 1341 & fn. 3.) We do not know of any decision that has applied this rule when, as here, the police have prevented a suspect's agents from retrieving the suspect's property inside the room before expiration of the tenancy.

whether petitioner's trial attorneys were incompetent for failing to challenge Moore's initial seizure of the room.[7]

Thus, a motion to suppress the rifle found in petitioner's motel room on the ground that investigator Moore illegally seized the room when he asked motel manager Proctor not to let anyone into the room without police permission would not have been meritorious, both because (as explained in part III, *ante*) the seizure was lawful, and because (as explained in this part) under the "independent source" doctrine the subsequent seizure of the rifle by the police was not a "fruit" of Moore's initial seizure of the room. Petitioner's trial attorneys were therefore not incompetent for failing to raise this theory in their motion to suppress the gun that the police seized from his motel room.

## DISPOSITION

The judgment of the Court of Appeal is reversed. The matter is remanded to that court with directions to deny petitioner's second petition for writ of habeas corpus and to reinstate petitioner's appeal, which the Court of Appeal had dismissed as moot.

George, C. J., Mosk, J., Baxter, J., and Chin, J., concurred.

---

[7]Justice Brown's concurring opinion asserts that the analysis supporting our holding that the search warrant was an "independent source" justifying the seizure of petitioner's rifle is "incomplete," because we do not resolve "a vigorously disputed factual issue—namely, whether the search warrant was itself tainted by investigator Moore's subsequent entry into the motel room . . . ." (Conc. opn., *post*, at p. 394.) That issue, however, need not be addressed in this habeas corpus proceeding pertaining to the competence of petitioner's trial counsel. Petitioner's trial counsel raised and litigated this issue in the trial court, and thus acted competently in this regard, even if we were to assume that the warrant was invalid.

Justice Brown further objects that we do not address petitioner's claim that the warrant was tainted by material omissions. Although petitioner raised that claim at trial, he has not asserted it before this court. Therefore, we need not consider it.

Justice Brown would resolve this case under the "inevitable discovery" doctrine (see *Nix* v. *Williams* (1984) 467 U.S. 431 [104 S.Ct. 2501, 81 L.Ed.2d 377]), reasoning that police officers would inevitably have discovered the rifle in petitioner's motel room regardless of whether their initial seizure of that room was valid. She acknowledges that such a discovery would not truly have been inevitable because, absent the seizure, petitioner's father might have removed the rifle before the police discovered it; nonetheless, she concludes that the inevitable discovery doctrine applies because "there is no constitutional right to destroy evidence." (Conc. opn., *post*, at p. 395.) To arrive at this result, however, Justice Brown must sail in uncharted waters. We do not know of any decision holding that the prosecution may resort to the inevitable discovery doctrine to prevent suppression of illegally seized evidence when, as here, a defendant could have caused the removal or destruction of the evidence. We have resolved this case using the *independent source* doctrine, in accordance with United States Supreme Court authority holding the doctrine to be applicable in these circumstances. We therefore need not express our views on the applicability of the *inevitable discovery* doctrine to the facts of this case.

**WERDEGAR, J.**—I concur in the majority opinion. I agree, as the majority states, that *Segura* v. *United States* (1984) 468 U.S. 796 [104 S.Ct. 3380, 82 L.Ed.2d 599] is dispositive. Because *Segura* is dispositive, the majority's discussion of the further question, whether an 18-hour seizure of defendant's motel room, based only on reasonable suspicion, was a violation of the Fourth Amendment, is unnecessary. Principles of judicial restraint counsel that we not reach out to decide gratuitously constitutional questions of first impression. Sound jurisprudence dictates that such issues be decided only in the context of cases and controversies actually raising the issue. I would await such a case.

**BROWN, J.,** Concurring.—This straightforward case has been needlessly complicated by the failure to distinguish between two closely related, yet analytically distinct, legal doctrines—the independent source doctrine and the inevitable discovery doctrine. This confusion has dogged the case from the outset. At the hearing on the initial suppression motion, petitioner argued that the search warrant was not an "independent source" for the evidence found in his motel room because the decision to seek the warrant was based on the allegedly unlawful entry of District Attorney Investigator Brian Moore. Notwithstanding this argument, the trial court deemed this "a classic case . . . of an inevitable discovery," observing "[i]t's probably the clearest case of inevitable discovery that I have seen in a motion." The confusion has persisted even in this court, where the Attorney General has chosen to "refer to the doctrines interchangeably."

The United States Supreme Court has described the relationship between the two doctrines as follows: "The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation. That doctrine, although closely related to the inevitable discovery doctrine, does not apply here; [the defendant's] statements to [a police detective] indeed led police to the [evidence in question], but that is not the whole story. The independent source doctrine teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred. [Citations.] When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation. There is a functional similarity between these two doctrines in that exclusion of evidence that would inevitably have been discovered would also put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place. Thus, while the independent

source exception would not justify admission of evidence in this case, its rationale is wholly consistent with and justifies our adoption of the ultimate or inevitable discovery exception to the exclusionary rule." (*Nix* v. *Williams* (1984) 467 U.S. 431, 443-444 [104 S.Ct. 2501, 2508-2509, 81 L.Ed.2d 377], fn. omitted, original italics; see also *Murray* v. *United States* (1988) 487 U.S. 533, 539 [108 S.Ct. 2529, 2534, 101 L.Ed.2d 472] ["The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." (Original italics.)].)

In the second portion of its analysis, the majority applies the independent source doctrine, concluding that "[e]ven if we were to assume that investigator Moore illegally seized petitioner's motel room when he told motel manager Proctor not to let anyone enter it without law enforcement permission, the rifle found in the room was not the 'fruit' of that seizure and therefore need not have been suppressed, because after the entry the police utilized an 'independent source' to seize the rifle: a search warrant issued on the basis of facts unrelated to Moore's conduct." (Maj. opn., *ante*, at p. 389.) In my view, the majority's analysis is incomplete because it does not definitively resolve a vigorously disputed factual issue—namely, whether the search warrant was itself tainted by investigator Moore's subsequent entry into the motel room, which petitioner also contends was unlawful. (See *id.* at pp. 391-392.) Nor does it resolve petitioner's claim that the warrant was invalid because material facts were recklessly or intentionally omitted from the warrant affidavit. (See *id.* at p. 379, fn. 1.) The search warrant cannot be deemed an "independent source" vitiating the initial seizure unless it was obtained "by means wholly independent of *any* constitutional violation." (*Nix* v. *Williams*, *supra*, 467 U.S. at p. 443 [104 S.Ct. at p. 2508], italics added.) Two wrongs do not make a right.

That having been said, I would hasten to add that we need not tackle the thorny factual questions necessary to resolve the case under the independent source doctrine. Instead, we should resolve the case under the inevitable discovery doctrine, as to which the pertinent facts are undisputed. From the time investigator Moore first contacted the motel manager to the time petitioner's motel room tenancy expired, a period of less than 24 hours, petitioner was continuously in custody. The gun case remained in his motel room in plain view. The motel manager testified, without contradiction, that it was the motel's policy to contact the authorities if any weapons were found after the expiration of a motel room tenancy and that motel officials would have done so in this case. Moreover, she testified, again without contradiction, that she would have permitted the authorities to search the

room later in the day. Such a search, conducted after the expiration of the tenancy, would, of course, have been lawful. (See *Abel* v. *United States* (1960) 362 U.S. 217, 241 [80 S.Ct. 683, 698, 4 L.Ed.2d 668].) Thus, *regardless* of whether the initial seizure and the subsequent entry of petitioner's motel room were lawful, issues as to which I express no opinion, the evidence would inevitably have been discovered, either as a result of motel officials contacting the authorities or as a result of a lawful search of the motel room.

In declining to apply the inevitable discovery doctrine, the Court of Appeal noted that petitioner's father might have been able to "clean[] out the room at his son's behest had the police not seized it." The fact that petitioner might have been able to arrange to have the evidence removed is simply irrelevant. As the majority properly holds, there is no constitutional right to destroy evidence. (See maj. opn., *ante*, at pp. 389-390.)

Since the evidence in question was admissible under the inevitable discovery exception to the exclusionary rule, petitioner's trial counsel cannot be faulted for failing to challenge the seizure of the motel room. On this basis, I concur in the majority's holding.

On April 1, 1998, the opinion was modified to read as printed above.