[No. B173901. Second Dist., Div. Six. Dec. 2, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
SERGIO DURAZO, Defendant and Appellant.

COUNSEL

Kenneth I. Clayman, Public Defender, and Michael C. McMahon, Chief Deputy Public Defender, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Kenneth N. Sokoler and Michael A. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**PERREN, J.—** ■ Few statements in the law are as often repeated: "[A]n investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith." *In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957].) ■ (The Fourth Amendment's protection against unreasonable searches and seizures dictates that traffic stops must be supported by articulable facts giving rise to a reasonable suspicion that the driver or a passenger has violated the Vehicle Code or some other law. (*People v. Miranda* (1993) 17 Cal.App.4th 917, 926 [21 Cal.Rptr.2d 785].) In this case, the police officer who conducted the traffic stop did so on a mere hunch that the defendant and his passenger were involved in criminal activity. In other words, the facts known to the officer were insufficient to support the objectively reasonable suspicion necessary to justify a detention under the Fourth Amendment.

The genesis of the stop was a college student's report to the police that unknown "Mexican gang members" had called him several times threatening to come to his apartment about 6:00 a.m. the following morning. When the police attempted to elicit more information regarding the circumstances surrounding the threat, the victim was evasive in replying. No one came to the victim's apartment the following morning. Four mornings later, and with no further threats reported, a police officer observed two young men who appeared to be Hispanic looking in the direction of the victim's three-story apartment building as they drove by. That building is surrounded by several similar buildings where approximately 700 students reside. The officer followed the car for approximately three miles as it left the area.

Although the officer had a "gut" feeling that the car's occupants were involved in the threats against the victim, he observed no equipment or traffic violations that would justify a traffic stop. Nonetheless, the officer decided to stop the car. A semiautomatic pistol, a loaded magazine, and gloves were found under the passenger's seat. The driver, Sergio Durazo, was arrested and

charged with being a felon in possession of a firearm (Pen. Code, § 12021, subd. (a))[1]. After the trial court denied Durazo's motion to suppress the gun as the product of an unlawful detention, he pleaded guilty to the charged crime and was sentenced to six years in state prison. We reverse the order denying Durazo's motion to suppress, and direct the trial court to dismiss the case.

## FACTS AND PROCEDURAL HISTORY

At approximately 1:00 a.m. on September 5, 2003, Sergeant Jeffrey Cowgill of the California State University at Channel Islands (CSUCI) Police Department responded to a telephone call from James Ash at his campus apartment on Cathedral Cove in Camarillo. Ash told Cowgill he had received "several threatening telephone calls" that day from individuals claiming they were from Oxnard. Ash said the callers were Mexican gang members, but he offered no explanation to support that conclusion. Ash also claimed the callers told him they were coming to his apartment the following morning. Ash claimed he did not know the callers or why they were threatening him. When Cowgill pressed Ash for specific details regarding the threats, he was "nonresponsive" and simply refused to answer questions.

Cowgill arranged for university officers to patrol the area the following morning, and directed another officer to note Ash's report in a departmental "briefing book" so that other officers would be aware of it. The handwritten entry noted that officers should be on the lookout for Hispanic males in the vicinity of Ash's apartment about 6:00 a.m. on September 5. The entry stated in pertinent part: "9-5-03—0100 Hrs. [¶] Report of a poss armed suspect outside res. 200 Cathedral Cove # 9—Resident James Ash stated he has had several threatening phone calls from unknown Hispanic males making threats against him. Ash also stated they said they would be at his residence at 6:00 a.m. this morning. Ash stated he has no idea why they are making the threats."

September 5 passed without any suspicious activity observed at or near Ash's apartment. Four days later, on September 9, 2003, CSUCI Police Officer Shawn Bartlett reviewed the briefing book entry and decided to patrol the area near Ash's apartment because he believed "the threat hadn't occurred yet." At approximately 7:00 a.m., Bartlett had completed his patrol and was leaving the area, when he observed a car turning left onto Anacapa Street from the intersection of Anacapa and Cathedral Cove. Bartlett could see that the driver and passenger were both Hispanic males. As they made the turn, Bartlett observed both the driver and passenger look in the direction of the

---

[1] Statutory references are to the Penal Code unless otherwise noted.

three-story apartment building on the corner where Ash lived.[2] Bartlett thought that the act of looking at Ash's building was suspicious, because "[i]t was both occupants actually turning in their seat and looking at the building. Which to me struck me as strange as to why. [¶] I could see a driver turning and looking, because he is in the process of making a turn. But to have a passenger look and turn at a building on the side on the road, if that's in fact what they were looking at, that's what struck me as strange. [¶] Then it hit me that I'm here at this time, and it's two Hispanic males, they're looking at the building." Bartlett emphasized that he had observed both men "turning their upper bodies. It wasn't like they made a real aggressive turn, but it wasn't just a head glance."

Bartlett did not observe the car stop or slow down in front of Ash's apartment. Instead, the car proceeded away from the area at the posted speed limit of 20 miles an hour.[3] Bartlett decided to follow the car, hoping he would "find probable cause on the car, a taillight or something out." During this time, Bartlett ran the license plate on the car and discovered it was registered to a woman in Oxnard. He did not observe any traffic or equipment violations that would have warranted a stop. He considered it suspicious, however, that the driver was "extremely cautious in how [he] drove," which led Bartlett to believe the driver did not "want to get pulled over."

After following the car for approximately three miles, Bartlett decided to make a traffic stop. He believed the stop was justified because (1) the driver and passenger appeared to be Hispanic, (2) both had looked in the direction of the victim's apartment building as they drove by, and (3) the driver was careful to comply with all traffic laws while the officer was tailing him. After Bartlett activated his lights, he saw the passenger appear to manipulate an unidentifiable object and move around in his seat. This conduct gave Bartlett a "gut feeling" that the passenger was hiding contraband. Durazo and Juan Gomez were identified as the driver and passenger, respectively. Bartlett's partner told him that he saw Gomez push something under his seat after the stop. When Bartlett discovered that Gomez was subject to search terms, he searched under the passenger seat and found a semiautomatic pistol, a 30-round magazine, and a pair of black gloves. Durazo was arrested. It was later determined he was on parole for an unlawful firearm activity conviction (§ 12021, subd. (e)).

---

[2] Ash lived in a building containing 10 or 20 units that housed 40 to 50 residents. That building is surrounded by several others housing approximately 700 students. The uncontroverted evidence also indicates that the rear side of Ash's apartment faces Anacapa Street.

[3] Although the People claim that the car traveled on Anacapa Street at a speed of five miles an hour, Bartlett testified that the vehicle was traveling at that speed only as it turned left onto the street.

Durazo was charged with a violation of section 12021, subdivision (a), and pleaded not guilty. At the preliminary hearing, Durazo moved to suppress the gun as the fruit of an unlawful detention. The magistrate denied the motion, finding that "although I think it's very, very close, that the officer did have or did articulate facts which construed objectively in conjunction with the briefing report and the conduct reported by Mr. Ash, the driving pattern of either making a U-turn or making a left-hand turn off of a street, and both the driver and passenger at least rotated their upper torso to look in the direction of . . . [Ash's] apartment . . . at 6:30 in the morning, the vehicle carrying unknown Hispanic males, is sufficient to justify an investigative stop." Pursuant to section 1538.5, subdivision (i), Durazo renewed his suppression motion after an information was filed. Another judge denied the renewed motion.

## DISCUSSION

■ In reviewing trial courts' rulings on suppression motions, we uphold any express or implied factual findings that are supported by substantial evidence. We independently determine as a matter of law, however, whether the challenged police action violated the Fourth Amendment protection against unreasonable searches and seizures. (*People v. Hughes* (2002) 27 Cal.4th 287, 327 [116 Cal.Rptr.2d 401, 39 P.3d 432].)

■ The Fourth Amendment protects against unreasonable searches and seizures by law enforcement. (*Katz v. United States* (1967) 389 U.S. 347, 353 [19 L.Ed.2d 576, 88 S.Ct. 507]; *People v. Maury* (2003) 30 Cal.4th 342, 384 [133 Cal.Rptr.2d 561, 68 P.3d 1].) "Although police officers may not arrest or search a suspect without probable cause and an exception to the warrant requirement, they may temporarily detain a suspect based only on a 'reasonable suspicion' that the suspect has committed or is about to commit a crime. [Citations.] Such detentions are permitted, notwithstanding the Fourth Amendment's requirements of probable cause and a search warrant, because they are 'limited intrusions' that are 'justified by special law enforcement interests.' [Citations.]" (*People v. Bennett* (1998) 17 Cal.4th 373, 386–387 [70 Cal.Rptr.2d 850, 949 P.2d 947].)

■ "An ordinary traffic stop is treated as an investigatory detention, i.e., a '*Terry*[4] stop.' [Citations.] 'Under this approach, we examine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." ' [Citations.]" (*People v. Bell* (1996) 43 Cal.App.4th 754, 760–761 [51 Cal.Rptr.2d 115].) A *Terry* stop is justified only if it is "based on

---

[4] *Terry v. Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868].

at least reasonable suspicion that the driver has violated the Vehicle Code or some other law. [Citation.]" *(Id.,* at p. 761.)

■ As the United States Supreme Court has explained, "The touchstone of the Fourth Amendment is reasonableness. [Citation.]" *(Florida v. Jimeno* (1991) 500 U.S. 248, 250 [114 L.Ed.2d 297, 111 S.Ct. 1801]; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 971 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) "Under *Terry* the touchstone of reasonableness for search or seizure without probable cause is the presence of 'specific and articulable facts' that reasonably warrant the intrusion on personal liberty and privacy. [Citation.]" *(People v. Glaser* (1995) 11 Cal.4th 354, 374 [45 Cal.Rptr.2d 425, 902 P.2d 729].)

The specific and articulable facts offered in support of the seizure at issue here are as follows: Durazo and his passenger are young Hispanic males who looked in the direction of a large apartment complex at approximately the same time of morning that an individual who lived there had claimed that Mexican gang members were going to attack him, albeit four days earlier.[5] Although the determination of reasonableness in the context of the Fourth Amendment is inherently case-specific (see, e.g., *People v. Pressey* (2002) 102 Cal.App.4th 1178, 1189–1190 [126 Cal.Rptr.2d 162]), we do not share the trial court's view that the facts in this case present a close case on the issue of reasonableness. The officer who stopped Durazo admitted he was not even sure if Durazo and his passenger were looking at Ash's apartment building, much less whether they were looking at his specific apartment. Moreover, Durazo continued driving for three miles away from the vicinity of Ash's apartment building without incident before the officer decided to stop them. The officer also failed to articulate any facts that would have led a reasonable officer to believe that the threat against Ash would be carried out four days after he claimed it was to have occurred. (Cf. *People v. Hulland* (2003) 110 Cal.App.4th 1646, 1652 [2 Cal.Rptr.3d 919] [discussing the doctrine of staleness in the context of determining whether a warrant is supported by probable cause].)

■ The officer also observed that both Durazo and his passenger were Hispanic, but reliance on that immutable characteristic, without more, would amount to impermissible racial profiling. (See § 13519.4, subds. (d), (e) [prohibiting racial profiling, which is defined as "detaining a suspect based on a broad set of criteria which casts suspicion on an entire class of people without any individualized suspicion of the particular person being stopped"].) Although the totality of the circumstances gave the officer a "gut feeling" that Durazo and his passenger were involved in criminal activity, a

---

[5] The People concede that Durazo's compliance with traffic laws is irrelevant in determining whether the detention was supported by reasonable suspicion.

mere hunch is insufficient to create the reasonable suspicion necessary to justify a Fourth Amendment intrusion. (*United States v. Sokolow* (1989) 490 U.S. 1, 7 [104 L.Ed.2d 1, 109 S.Ct. 1581]; *People v. Bennett, supra,* 17 Cal.4th at p. 387.)

The People cite three federal cases, none of which supports their position that the traffic stop at issue in this case was supported by reasonable suspicion. First, in *United States v. Terry-Crespo* (9th Cir. 2004) 356 F.3d 1170, a *Terry* frisk was upheld where the police immediately responded to a 911 call and encountered a young Hispanic man wearing clothing described by the caller, who claimed that the man had just threatened him at the very intersection where the police found him. (*Id.*, at p. 1174.) The circumstances in the instant matter were significantly more attenuated. As we have already noted, a driver and passenger's mere act of looking in the direction of a large apartment building as they pass by does not give rise to an objectively reasonable suspicion that they were involved in a threat against a resident of that building that was supposed to be carried out several days earlier.

In *United States v. Pace* (7th Cir. 1990) 898 F.2d 1218, the police conducted a traffic stop of the defendant and his passenger after he was observed exiting and entering another individual's parking garage while driving that individual's car. The stop was conducted three weeks after the police became aware of information indicating that the Chicago organized crime syndicate might assassinate the individual whose car the defendant was driving. (*Id.*, at p. 1224.) The court concluded that, under the circumstances, it was objectively reasonable for the officers who conducted the stop to believe that the defendant "might be an assassin on his way to do his work . . . ." (*Id.*, at p. 1229.) We agree that it was not unreasonable for the police in that case to believe that an assassination attempt by a large crime syndicate might take place three weeks after it was first suspected. Here, by contrast, the facts articulated by the detaining officer did not give rise to an objectively reasonable suspicion that Durazo and his passenger were planning to carry out an attack that, according to the alleged victim, was supposed to take place several days earlier.

Finally, in *Flowers v. Fiore* (1st Cir. 2004) 359 F.3d 24, the court affirmed the grant of summary judgment in favor of police officers and a town in an action brought by a motorist claiming he had been stopped in violation of his Fourth and Fourteenth Amendment rights. The stop occurred after a witness called the police to report that his friend had just warned him that an individual named Butch Corbin, who had a "falling out" with the witness's grandson, was sending two armed African-American men to his house. The witness also reported that he had just seen two African-American men drive by his house in a black or gray car. (*Id.*, at p. 26.) Within 30 minutes of the

call, the plaintiff, an African-American man, was seen approximately a half-mile away driving a gray car in the direction of the witness's house. Believing that he might be on his way to carry out the threat conveyed by Corbin, the police stopped the plaintiff's car and searched him for weapons. (*Id.*, at pp. 26–28.)[6] In concluding that the stop was supported by reasonable suspicion, the court explained: "Equipped with a description confirmed by [the witness's] firsthand observation, it was reasonable for [the officer] to follow the first African-American male in a black or gray car he observed in the immediate area of the [witness's] residence. That as long as half an hour may have elapsed after he left the [witness's] residence (as opposed to twenty minutes) arguably attenuates the reasonableness of [the officer's] suspicion that [the plaintiff] was indeed the suspect. However, we do not believe that a matter of ten minutes disposes of suspicion altogether, especially when a car and driver substantially matching the given description eventually appear. That [the officer] did not see a second African-American male in the car is adequately countered by [the officer's] explanation that he thought a second man either could have been dropped off or was hiding in the car. Against the immediacy and gravity of the reported threat, [the officer] was justified in following through on his initial observation." (*Id.*, at p. 33.)

Although this case involves a similar type of threat, the immediacy of that threat was entirely lacking. Durazo was observed driving by Ash's apartment a full four days after the reported threat was to be carried out. Instead of providing a firsthand witness description of suspects and a vehicle, Ash merely told the police that individuals he did not know, who claimed to be Mexican gang members, had threatened to attack him that morning. Although attempts were made to elicit information from Ash that would have assisted in determining who had made the calls and why, his answers to law enforcement questioning on those issues were nonresponsive. Moreover, unlike the motorist in *Flowers*, Durazo had traveled approximately three miles *away* from the vicinity where the attack was expected to take place by the time Deputy Bartlett decided to stop him. Bartlett also admitted that he had no idea whether Durazo or his passenger were actually looking at Ash's apartment as they drove by, and that he had followed them hoping to observe a traffic or equipment violation that would justify a traffic stop. Having failed to observe any such violations, an objectively reasonable officer would have known that insufficient facts existed to warrant a traffic stop.

---

[6] Durazo refers to the fact that the officer who stopped the plaintiff in that case also ran a registration check on the plaintiff's car before the stop and discovered that the license plate was issued to another car. (*Flowers v Fiore, supra,* 359 F.3d at p. 27, fn. 1.) The detaining officer also admitted, however, "that the license plate discrepancy played no role in his decision to follow and stop the vehicle." (*Ibid.*)

## CONCLUSION

■ "[I]t is the right of every person to enjoy the use of public streets, buildings, parks, and other conveniences without unwarranted interference or harassment by agents of the law." (*In re Tony C., supra*, 21 Cal.3d at p. 893.) This right, however, is tempered by law enforcement's right to effect a limited detention of one whom the officer reasonably and in good faith suspects of being engaged in criminal activity. (*Terry v. Ohio, supra*, 392 U.S. at p. 22.) These cases are inherently fact specific. (*Tony C., supra*, at p. 893.) However sincere Officer Bartlett's intentions may have been, his self-described "gut" feeling lacked the requisite objective showing to justify Durazo's detention. No crime had occurred at or near the time reported. The officer's observed "glance" at the alleged victim's residence was merely a general glance in the direction of numerous residences. The only observed slowing of Durazo's vehicle occurred during a left turn, and no violation of law was ever observed in the vehicle's operation despite the officer's three-mile pursuit. The only "facts" that distinguished the case in the officer's mind were the ethnicity of the vehicle's occupants, and the perceived unusual manner in which they both looked in the direction of the alleged victim's multi-unit apartment building as they drove by. These facts are insufficient to justify law enforcement's interference with the free use of a public street and the resulting incursion into Durazo's liberty.

Accordingly, the judgment is reversed and the cause remanded to the trial court with directions that it be dismissed.

Gilbert, P. J., and Coffee, J., concurred.