[No. H020724. Sixth Dist. Mar. 13, 2001.]

In re ELIZABETH G., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
ELIZABETH G., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of the section of the Discussion entitled *Accessory Convictions*.

## COUNSEL

Catherine White for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, René A. Chacón and Bruce Ortega, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAMATTRE-MANOUKIAN, J.**—The minor, Elizabeth G., appeals after the juvenile court sustained a Welfare and Institutions Code section 602 petition alleging that the minor committed two violations of Penal Code section 32 (accessory after the fact) and three violations of Penal Code section 12101, subdivision (a)(1) (possession of a firearm). She was placed on probation for two years.

On appeal, and in a petition for writ of habeas corpus, the minor contends that she received ineffective assistance of counsel, in that counsel failed to present certain evidence and arguments at her motion to suppress. The minor also contends that one of her convictions for being an accessory after the fact must be reversed.

. We will affirm the judgment. We have disposed of the petition for writ of habeas corpus by separate order issued this day.

## BACKGROUND

On August 9, 1998, at 10:44 p.m., Salinas police officers responded to a shooting of two teenagers on Antigua Avenue. One teenager had been shot and killed; the other had been shot but survived. Shell casings from two different caliber weapons (.45-caliber and .380-caliber) were found on the scene.

A neighbor reported hearing gunshots and seeing a full-size newer model Chevrolet pickup truck driving slowly by the scene, with its headlights off. A second witness reported seeing a full-size newer model red Chevrolet pickup cruising near the scene prior to the shooting. At 11:02 p.m., an officer observed a truck matching these descriptions. The truck was within a mile of the shooting; it had stopped in front of 518 Green Street and appeared to be dropping off a passenger. An officer stopped the truck after it had traveled a few blocks further.

The driver of the truck was the minor's brother, Juan Manuel G., a certified gang member who had been arrested for a previous shooting. Juan Manuel G. stated that he was coming from his home at 727 Galindo Street,

which was located about 12 blocks from the shooting. He said that he had just dropped someone named George off near the intersection of Galindo Street and Del Monte Avenue.

Juan Manuel G. was taken into custody. Meanwhile, several officers were dispatched to 727 Galindo Street at 12:15 a.m. on August 10, 1998, in order to secure the residence while another officer prepared an affidavit in support of a search warrant.

Four females, including the minor, were present at 727 Galindo Street. The minor was dressed in sweats or nightclothes and appeared to have been sleeping. The police ordered all four females into the living room and explained that they would have to be escorted through the residence. The minor was upset that the police had entered the residence without a search warrant; she was "somewhat argumentative and questioning." An officer noticed that the minor had cuts on both of her hands.

The minor made several requests to do some laundry. The police would not allow her to do so and considered the requests unusual, in light of the fact the minor appeared to have been sleeping prior to their entry into the residence.

The minor left the residence sometime after 2:00 a.m., accompanying her mother to the hospital. The minor returned to the residence about 5:30 a.m., saying she had come back to get some belongings.

Officer Stan Cooper escorted the minor to her bedroom, where she gathered some clothing, shoes, and toiletries. The minor asked if she could take her laundry basket with her so that she could do her laundry. Officer Cooper said he would need to inspect the laundry basket. The minor picked up two items of clothing and dropped them back into the basket, saying, "See, there's nothing in here." Officer Cooper insisted on conducting a more thorough search. In response, the minor again picked up two items and dropped them back into the basket. As she did so, Officer Cooper noticed a neatly folded blue towel, which appeared to have something inside of it. He again told the minor that he needed to look more closely at the laundry basket before allowing her to take it. As he went to reach for the basket, the minor grabbed it. Officer Cooper engaged in a "kind of tug-of-war" with the minor. He noticed that the laundry basket seemed heavier than he expected. The minor eventually told Officer Cooper she could just leave the laundry basket there. She appeared nervous and agitated.

The minor then left the residence. An officer arrived with the search warrant shortly thereafter. Officer Cooper then searched the laundry basket,

finding three handguns: two .45-caliber semiautomatic handguns, and one .380-caliber semiautomatic handgun.

Two days after the shooting, on August 11, 1998, the minor was interviewed by Detective Gerard Ross and Detective Joe Gunter. The trial court viewed a videotape of the interview during the jurisdictional hearing.

During her interview with the detectives, the minor explained that on the night of the shooting, she and her brother went to a coworker's birthday party from about 8:00 p.m. until about 10:00 p.m. After they left, her brother dropped her off at home. She fell asleep about 10:30 p.m. She did not know that the guns were in her laundry basket. The day after the shooting, her brother told her he had placed them there. The minor asserted that she had sustained the cuts on her hands while struggling with a friend over a key chain.

Detective Gunter asked the minor, "Who else did your brother say was with him when he was involved with this?" The minor claimed, "He didn't tell me" but asserted that she thought it was "ridiculous" for her brother "to be driving and do a drive by . . . and be the only one . . . ." She said that she would turn in "the guys" who were involved if she knew who they were. She mentioned that there was "a guy" who "kept on calling to my house" the night of the shootings. The caller, who refused to give his name, asked where her brother was. He called back repeatedly, asking if the police were still at the minor's house and if the police were going to search the house. During the interview, the minor maintained that she did not know the identity of the caller, but on the night of the shootings she told the police that the caller was her cousin.

Detective Ross also interviewed the minor's mother and father. They claimed they had been asleep on the night of the shooting and thus had not heard or seen the minor or her brother enter the house. They woke up when they heard the shots, but went back to sleep without getting up. At trial, their testimony was somewhat different. The minor's mother testified that after hearing the shots, she went to the minor's bedroom and prayed with the minor. The minor's father testified that the minor and her brother had returned to the house together after attending the birthday party.

On April 8, 1999, the People filed a Welfare and Institutions Code section 602 petition. Count 1 alleged that the minor was an accessory after the fact to second degree murder; count 2 alleged that the minor was an accessory after the fact to attempted murder. (Pen. Code, § 32.) Counts 3, 4, and 5 alleged that the minor possessed firearms. (Pen. Code, § 12101, subd. (a)(1).)

The minor moved to suppress the evidence obtained from the seizure of her residence and from the execution of the search warrant, including the handguns, the minor's statements, and the officers' observations of the minor. In the written motion, counsel for the minor argued that the search warrant was not supported by probable cause. He also argued that there was not probable cause or exigent circumstances to justify the seizure of the residence. Finally, he argued that the minor's statements should be suppressed as "fruit of the poisonous tree." The People's response to the minor's motion to suppress addressed only the minor's argument that there was not probable cause to support the search warrant.

At the hearing on the motion to suppress, counsel for the minor addressed the People's written response and then submitted the matter "on my points and authorities." The prosecutor commented that she believed "the police did a very good and thoughtful job in not going and searching the residence under exigen[t] circumstances or anything like that . . . , they waited, went and got the warrant . . . ." She, too, submitted the matter "on my points and authorities."

The juvenile court denied the motion to suppress. It found that the police reasonably stopped the red Chevrolet pickup truck. It found that once the police discovered the driver of the pickup truck was the minor's brother, a known gang member, it was reasonable for the police to suspect the incident was gang-related. Noting that the pickup truck had been seen near the 727 Galindo Street residence, the juvenile court found it was reasonable for the police to freeze that residence while obtaining a warrant, as it was likely that firearms would be found there.

At the jurisdictional hearing, the juvenile court found the allegations in the petition to be true. At the dispositional hearing, the juvenile court adjudged the minor to be a ward of the court and placed her on probation for two years.

## DISCUSSION

### Ineffective Assistance of Counsel

The minor contends that she received ineffective assistance of counsel at the motion to suppress, in that counsel did not adequately present certain evidence and arguments in support of the motion. Specifically, she faults trial counsel for failing to argue, at the hearing on the motion, that the warrantless entry into her home was not justified by exigent circumstances.

In order to establish that counsel was constitutionally ineffective, defendant must show (1) that he failed to act in a manner to be expected of

a reasonably competent attorney acting as a diligent advocate and (2) that defendant was prejudiced thereby. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 [233 Cal.Rptr. 404, 729 P.2d 839]; *People v. Pope* (1979) 23 Cal.3d 412, 423-425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]; *Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [104 S.Ct. 2052, 2064-2065, 80 L.Ed.2d 674].)

■ Regarding the first prong, if trial counsel's omissions stemmed from an informed tactical choice that a reasonably competent attorney might make, the conviction must be affirmed. (*People v. Pope, supra*, 23 Cal.3d at p. 425; *People v. Lucas* (1995) 12 Cal.4th 415, 437 [48 Cal.Rptr.2d 525, 907 P.2d 373]; *People v. Diaz* (1992) 3 Cal.4th 495, 557 [11 Cal.Rptr.2d 353, 834 P.2d 1171].) We must be "highly deferential" to the tactical decisions made by counsel. (*Strickland v. Washington, supra*, 466 U.S. at p. 689 [104 S.Ct. at p. 2065].) There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Ibid.*)

■ As for the second prong, a defendant establishes prejudice by demonstrating that without the deficient performance there is a reasonable probability the result would have been more favorable. In other words, even if counsel's actions fall below the threshold of reasonableness, appellant must still demonstrate that counsel's actions were prejudicial. (*People v. Ledesma, supra*, 43 Cal.3d at p. 218.) In fact, we "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . , that course should be followed." (*Strickland v. Washington, supra*, 466 U.S. at p. 697 [104 S.Ct. at p. 2069].)

Here, counsel for the minor did raise the exigent circumstances issue in his written motion to suppress, but he did not argue the issue at oral argument. However, even assuming that reasonable counsel would have orally presented such an argument, it is not reasonably probable that the juvenile court would have granted the motion to suppress.

■ " '[A] warrantless entry by the police into a residence is at least presumptively unreasonable and therefore unlawful.' (*People v. Williams* (1988) 45 Cal.3d 1268, 1297 [248 Cal.Rptr. 834, 756 P.2d 221].) As the United States Supreme Court has explained: 'In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.' (*Payton v. New York* (1980) 445 U.S. 573, 590 [100 S.Ct. 1371, 1382, 63 L.Ed.2d

639]).)" (*People v. Bennett* (1998) 17 Cal.4th 373, 384 [70 Cal.Rptr.2d 850, 949 P.2d 947] (*Bennett*).)

In *Bennett*, the court stated, "Neither the United States Supreme Court nor [the California Supreme Court] has delineated the circumstances under which a police officer who fears destruction or removal of evidence within a dwelling place before a search warrant can be obtained may enter the premises, thereby 'securing' them." (*Bennett, supra*, 17 Cal.4th at p. 384.)

The United States Supreme Court has now addressed the standards for a temporary seizure of a home while police obtain a search warrant. In the recent case of *Illinois v. McArthur* (2001) 531 U.S. 326, 331 [121 S.Ct. 946, 148, 148 L.Ed.2d 838] (*McArthur*), the court held that the police acted lawfully when they prevented the defendant from entering his home without police accompaniment while they were waiting for a search warrant, because there was "a plausible claim of specially pressing or urgent law enforcement need, *i.e.*, 'exigent circumstances.' [Citations.]" (*Id.* at p. 331 [121 S.Ct. at p. 950].)

In *McArthur*, the police accompanied the defendant's wife to her home while she removed her belongings. When the wife exited the home, she told the police that the defendant, who was inside the home, had marijuana. When the defendant refused to give the police permission to search the residence, the police prevented the defendant from reentering the residence without accompaniment by one of the officers. Meanwhile, a second officer left to obtain a search warrant. While the second officer was gone, the first officer accompanied the defendant into the trailer several times.

The court concluded that the warrantless seizure was reasonable, based on an analysis of four factors that "balance[d] the privacy-related and law enforcement-related concerns." (*McArthur, supra*, 531 U.S. at p. 331 [121 S.Ct. at p. 950].)

First, based on their observations of the defendant and his wife, the police had probable cause to believe that the defendant's home "contained evidence of a crime and contraband, namely, unlawful drugs." (*McArthur, supra*, 531 U.S. at p. 331 [121 S.Ct. at p. 950].) Second, the police had "good reason to fear that, unless restrained, [the defendant] would destroy the drugs before they could return with a warrant." (*Id.* at p. 332 [121 S.Ct. at p. 948].) Third, the police did not search the trailer or arrest the defendant; instead they "imposed a significantly less restrictive restraint." (*Id.* at p. 332 [121 S.Ct. at p. 950].) Fourth, the seizure lasted only two hours, "no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." (*Id.* at p. 332 [121 S.Ct. at p. 951].)

The temporary seizure in *McArthur* was not initiated by a police entry into the defendant's home, but it was nevertheless analogous to the temporary seizure here. In that case, the police did enter the defendant's home during the seizure: they accompanied the defendant when he went inside to obtain cigarettes and make a phone call. Thus, we believe that the United States Supreme Court's analysis is highly relevant to the question presented in the instant case, and that it compels the conclusion that the police lawfully entered the minor's residence for the purpose of securing it.

■■■ Here, the police had probable cause to believe that evidence of the murder would be found inside the minor's home. The shootings had occurred about 10:44 p.m., about 12 blocks away from the minor's residence at 727 Galindo Street. Two different firearms had been used in the shooting, indicating that two people were responsible. About 15 minutes after the shootings, the police stopped Juan Manuel G., the minor's brother, who lived at 727 Galindo Street. Juan Manuel G. was driving the vehicle identified by witnesses to the shootings. Juan Manuel G. was alone, but the police had observed him dropping off a passenger, and Juan Manuel G. himself admitted he had just dropped off someone named George near the Galindo Street residence. Juan Manuel G. was a known gang member who had been arrested for a previous shooting. No firearms were located in Juan Manuel G.'s car. These factors gave rise to probable cause to believe that firearms and other evidence, including Juan Manuel G.'s accomplice, would be found inside the minor's home.

The police also had "good reason to fear" that someone inside the minor's home would destroy the evidence before the police obtained a warrant. (*McArthur, supra,* 531 U.S. at p. 332 [121 S.Ct. at p. 950].) The police reasonably could have believed that Juan Manuel G. had entered the residence and instructed someone to destroy or hide evidence, or that Juan Manuel G.'s accomplice was inside the residence and that he or she would destroy or hide evidence in anticipation of a search.

The police did not search the home or arrest any of the occupants. Instead, they utilized a "less restrictive restraint," simply seizing the home and requiring police accompaniment when the occupants moved throughout the residence. (*McArthur, supra,* 531 U.S. at p. 332 [121 S.Ct. at p. 950].) The police did not prevent the occupants from leaving the home: the minor was permitted to accompany her mother to the hospital.

Finally, the seizure lasted for only a limited period of time. The police secured the minor's residence shortly after midnight and obtained the warrant around 5:30 a.m. There is no indication that the duration of the seizure

was "longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." (*McArthur, supra,* 531 U.S. at p. 332 [121 S.Ct. at p. 950].)

California case law predating *McArthur* also supports the conclusion that exigent circumstances justified the seizure of the minor's residence. ■ In considering the lawfulness of a warrantless entry for the purpose of securing a residence, most California and federal courts "followed the reasoning of the federal court of appeals in *United States* v. *Rubin* [(3d Cir. 1973)] 474 F.2d [262,] 268-296: 'When Government agents . . . have probable cause to believe contraband is present and, in addition, based on the surrounding circumstances or the information at hand, they reasonably conclude that the evidence will be destroyed or removed before they can secure a search warrant, a warrantless search is justified. The emergency circumstances will vary from case to case, and the inherent necessities of the situation at the time must be scrutinized. Circumstances which have seemed relevant to courts include (1) the degree of urgency involved and the amount of time necessary to obtain a warrant [citations]; (2) reasonable belief that the contraband is about to be removed [citations]; (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought [citation]; (4) information indicating the possessors of the contraband are aware that the police are on their trail [citation]; and (5) the ready destructibility of the contraband and the knowledge "that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic" [citations].' " (*Bennett, supra,* 17 Cal.4th at pp. 384-385.)

*People v. Daughhetee* (1985) 165 Cal.App.3d 574 [211 Cal.Rptr. 633] (*Daughhetee*), is similar to the instant case. In *Daughhetee*, the police were investigating an armed robbery. They received a description of the male robber, the getaway vehicle, and the female driver of the vehicle. Shortly thereafter, they found a vehicle matching the description and saw a woman leaving the residence where the vehicle was located. They arrested the woman and entered the residence after noticing two males inside. They detained the two males while waiting for a search warrant. On appeal, the court held that exigent circumstances justified the warrantless entry. First, there was a reasonable possibility that evidence inside the residence would be destroyed. Second, because a gun had been used during the robbery, there was a reasonable concern for officer safety. (*Id.* at p. 578.)

*People v. Gentry* (1992) 7 Cal.App.4th 1255 [9 Cal.Rptr.2d 742] (*Gentry*), stands in contrast to *Daughhetee.* In *Gentry*, the police received information

that one Steve Dallas was selling marijuana out of his car, across the street from the apartment in which he lived. The police arrested Dallas outside the apartment and sought a warrant to search the apartment, as they believed he might have been storing marijuana inside. While waiting for the warrant, the police entered the apartment and detained all of the occupants, including the defendant. On appeal, the court held there were no exigent circumstances justifying the warrantless entry into the apartment. Specifically, the court noted, "there was no showing that the police reasonably believed that a compatriot threatened the removal or destruction of evidence." (*Id.* at pp. 1263-1264.)

■ The instant case is analogous to *Daughhetee* and distinguishable from *Gentry*. After the police arrested Juan Manuel G., who lived at 727 Galindo Street and had just dropped off a possible accomplice near the residence, it was reasonable for the police to seize the residence and detain its occupants. There were " ' " " 'specific and articulable facts which, taken together with rational inferences . . . ,' support[ed] the warrantless intrusion." ' " (*Gentry, supra,* 7 Cal.App.4th at p. 1262.) Only one of the persons responsible for the shooting had been apprehended, and the firearms used had not been located. Thus, the exigent circumstances included, first, the possibility that evidence would be destroyed by a compatriot of Juan Manuel G. (See *People v. Camilleri* (1990) 220 Cal.App.3d 1199, 1211 [269 Cal.Rptr. 862]; cf. *Gentry, supra,* 7 Cal.App.4th at pp. 1263-1264.) It was likely the firearms used in the shooting were inside the residence, and that someone would try to hide them or wipe them clean in order to remove fingerprints. Second, because firearms had been used in the offense but had not been located, there was a reasonable concern for officer safety. (See *Daughhetee, supra,* 165 Cal.App.3d at p. 578.)

As the warrantless entry into the minor's residence was supported by exigent circumstances, it is not reasonably probable that the juvenile court would have granted the minor's suppression motion had counsel presented such an argument. For the same reasons, it is not reasonably probable that a "fruit of the poisonous tree" argument would have been meritorious. Therefore, the minor's claim of ineffective assistance fails.

*Accessory Convictions*\*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

\*See footnote, *ante,* page 496.

## DISPOSITION

The judgment is affirmed.

Cottle, P. J., and Wunderlich, J., concurred.

A petition for a rehearing was denied April 6, 2001, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied July 11, 2001.