**Marcus BRIDDELL, et al.**

v.

**Horace CHESTER, et al.**

**Civil Nos. JFM–01–1584, JFM–01–1596.**

United States District Court,
D. Maryland.

June 10, 2002.

Howard J. Needle, Baltimore, MD, for Marcus Briddell, Elinor Briddell.

Sharon Beth Benzil, Maryland Department of State Police Deputy Counsel, Pikesville, MD, for Horace Chester.

Thomas Jay Althauser, Dylan Megarity, Eccleston and Wolf PC, Baltimore, MD, for Ruedell Brown.

Kevin Bock Karpinski, Allen Karpinski Bryant and Karp PA, Baltimore, MD, for Lisa Purnell, Rusty A. Savage, City of Salisbury.

Thomas Jay Althauser, Dylan Megarity, for State of Maryland, Wicomico County.

## MEMORANDUM

MOTZ, District Judge.

Plaintiffs Marcus and Elinor Briddell brought this suit against Horace Chester, Rudell Brown, Lisa Purnell, Rusty Savage, the State of Maryland, Wicomico County, the City of Salisbury and unnamed law enforcement officers. The Plaintiffs allege violations of their federal constitutional rights under 42 U.S.C. § 1983 as well as a number of state constitutional and common law claims related to the seizure and subsequent search of their home. Previously, I dismissed all claims against the State of Maryland, Wicomico County and the City of Salisbury. I also dismissed all state law claims against Brown, Purnell and Savage. The defendants now move for summary judgment on all remaining counts. For the reasons stated below, their motions will be granted.

### I.

At approximately 1:20 a.m. on April 12, 2000, the Delmar Police Department attempted to make a traffic stop of a vehicle driven by Curtis E. Byrd, Jr. In attempting to evade the stop, Byrd lost control of the vehicle, crashing his vehicle into a ditch and then fleeing on foot. Shortly thereafter, Byrd was apprehended and almost a kilogram of crack cocaine was recovered which Byrd had discarded as he fled. A search of Byrd's vehicle revealed paperwork that indicated that Byrd and Kimya Lashay Washington were the owners of the vehicle and that their address was 28161 Charter Court in Salisbury, Maryland. Byrd also told police that this was his address. The residence at 28161 Charter Court is actually owned by the Rev. and Mrs. Briddell, Byrd's step-father and

mother. From the direction the car was traveling and its location, the police believed that Byrd was on his way to the Briddells' home. The police also found a key to a Mercedes during a search incident to Byrd's arrest.

At approximately 8:00 a.m. that same day, Detective Rusty Savage, a member of the Wicomico County Narcotics Task Force began investigating Byrd's case. He obtained criminal histories of Byrd and Washington, which revealed prior drug-related arrests for both of them. Around 9:30 a.m., Washington [1] arrived at the Delmar Police Department in a dark blue Mercedes registered in her name to inquire about Byrd. Several hours later, Savage drove by the Briddells' residence and observed Washington's blue Mercedes in the driveway.[2] A half hour later Savage contacted Sergeant Holland of the Wicomico County Sheriff's Office who was the Briddells' neighbor. Holland told Savage that he had observed suspicious activity by Byrd at the Charter Court residence, indicating possible drug trafficking. Savage, concerned that evidence within the home or vehicle might be destroyed, contacted Wicomico County Assistant State's Attorney Beau Oglesby who advised him to seal the residence until a search warrant could

be obtained. Savage contacted Maryland State Trooper Horace Chester and directed him to do so.

Trooper Chester and Wicomico County Sheriff's Deputy Rudell Brown arrived at the Briddells' residence some time between 12:30 and 2:00 p.m.[3] Mrs. Briddell answered the door and Chester identified himself. He explained that a warrant authorizing the search of her home was being prepared in connection with Byrd's arrest and that the officers were "seizing" her residence until the search could take place. Mrs. Briddell picked up the phone to call her husband and Chester told her she could not call anyone. However, Brown intervened and Mrs. Briddell called her husband and let him know what was happening. Chester then asked if anyone else was present in the house and was informed that Washington was asleep in another room. He escorted Mrs. Briddell to that room and asked her to wake Washington. All three then returned to the living room.[4]

Rev. Briddell arrived at the residence at approximately 1:20 p.m. According to Mrs. Briddell, Chester did not want to allow her to leave the house to speak with her husband, but allowed her to do so after Brown intervened.[5] E. Briddell Dep. at 83. Ac-

1. Washington is now married to Curtis Byrd and is known as Kimya Byrd. During the events relevant to this case, she was known as Kimya Washington and for the sake of clarity will be referred to by that name here.

2. The parties dispute the time at which certain events occurred. Savage claims that he drove by the Briddells' residence at approximately 12:30 p.m. Given the Briddells' timing of the sequence of events that followed, this drive-by would have had to occur earlier. The disputed times that are relevant to deciding the defendants' motions will be discussed below.

3. The Wicomico County Incident Inquiry that defendants submit shows Brown's dispatch time as 13:51:15 and his time of arrival on the

scene as 14:00:47. See Savage/Purnell Ex. 5. Mrs. Briddell insists that Chester and Brown arrived between 12:30 and 1:00 p.m. because *The Young and the Restless* was on television. E. Briddell Dep. at 80.

4. When they returned to the living room, an officer concealing his identity with a hood was also present. Midway through the afternoon, this officer was replaced with a different officer wearing a hood. The identities and affiliations of these two officers is not part of the record.

5. Rev. Briddell was not permitted to enter his house. He spent most of the afternoon in front of his house, returning to work for a short period of time at approximately 4:00

cording to Chester, he initially informed Mrs. Briddell and Washington that they could not leave and that the Mercedes would have to remain at the residence. However, moments later, Chester was informed that the women were free to leave the house, but that the Mercedes had to stay. He then passed this information along to Mrs. Briddell and Washington.

After a brief conversation with her husband, Mrs. Briddell returned to her house. Initially she went to her bedroom and laid down in bed. Chester stood in her doorway to observe her. After a few minutes, she went into the living room where she remained, with the exception of a brief conversation with Brown, until the search of her home began. Washington also spent the afternoon in the living room. She was on the phone frequently, including calls with Byrd in jail and to a lawyer who advised her that she and Mrs. Briddell could leave the residence. E. Briddell Dep. at 103. Mrs. Briddell also spoke with her son, among others, and called her employer to let them know she would not be coming to work. At some point in the afternoon, Brown left the Briddells' home and was replaced by an unknown officer.

Savage spent the day preparing a warrant that authorized the search of the Briddells' residence, Washington and the blue Mercedes. According to Savage, this warrant was signed between 5:30 and 6:00 p.m. When it was signed, Savage contacted the officers on the scene to notify them. Savage claims that the officers waited for Savage to arrive at the scene and serve the

warrant on Mrs. Briddell at approximately 6:10 p.m. before they began to search the house. Savage Dep. at 16–17. Rev. Briddell contends that he arrived at his home shortly after 5:00 p.m., and observed the police already searching his home. M. Briddell Dep. at 101–03. In addition, Mrs. Briddell testified that Savage did not serve her with the warrant when he arrived and that it was only later in the evening that Savage introduced himself to the Briddells and only as the search was ending that he showed them the warrant. E. Briddell Dep. at 127–30, 136.

Purnell's involvement in the incident was limited to strip-searching Washington. The strip-search was conducted in a bathroom of the Briddells' home and lasted less than fifteen minutes. The parties disagree about when Purnell arrived at the Briddells' home. According to Purnell's dispatch notes, Purnell arrived at the scene at 6:44 p.m., well after Savage arrived with the warrant. Purnell Dep. at 8. Rev. Briddell contends that the dispatch is incorrect and that he observed Purnell arrive at his home and enter before 6:00 p.m. In addition, Washington testified that Purnell arrived soon after Brown departed and that Purnell told her she did not have a warrant for the search she conducted. Byrd Dep. at 87, 91.

## II.

The basis for the Briddells' allegations that their constitutional rights were violated is both the seizure of their home and its subsequent search.[6] I will first consider

---

p.m. He came back to the residence around 5:00 p.m. and did not enter his home until several hours later.

**6.** In addition to the search and seizure, the Briddells' complaint also makes a claim of racial discrimination. Summary judgment will be granted on this claim because the record provides no support for it. Mrs. Brid-

dell acknowledged that she did not know of any Caucasians that defendants had treated differently than she was treated. She stated that the basis for her belief that she would have been treated differently if she was white was television shows she watched and newspaper articles she read where officers treated African–Americans poorly. E. Briddell Dep. at 157–58, 228–29.

the constitutionality of the seizure and then of the search.

### A.

Whether the warrantless seizure of the Briddells' home violated their constitutional rights must be considered under the standard recently articulated by the Supreme Court in *Illinois v. McArthur*, 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001). The primary factual difference between the present case and *McArthur* is that when the police first encountered McArthur, he was on the porch of his home and the police only entered his home once he chose to do so. *Id.* at 332, 121 S.Ct. 946. In this case, Mrs. Briddell was already in her home when the police arrived and they immediately entered and secured the home. However, in both cases, police entered a home and kept individuals in that home under observation to preserve evidence while a search warrant was being obtained. There is no reason why the factual variation requires a different standard for evaluation here than in *McArthur*.

■ The Supreme Court in *McArthur* articulated four factors that must be considered in determining whether the seizure of the Briddells' home was reasonable: first, whether the police had probable cause to believe that the Briddells' house contained evidence of a crime and contra-

band; second, whether the police had good reason to believe that, without the seizure, the evidence would be destroyed before a warrant could be obtained; third, whether the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy; and fourth, whether the restraint was imposed for a limited period of time. *Id.* at 331–32, 121 S.Ct. 946. The parties agree, and it is evident from the record, that the first two factors favor finding the seizure reasonable. Based on the present record, the last two factors also favor finding the seizure reasonable.

1.

■ Chester and the other police officers who seized the Briddells' house properly balanced their law enforcement needs with the personal privacy interests of both Rev. and Mrs. Briddell.[7] The present record reflects that Chester, Brown, and the other officers involved in the seizure respected the Briddells' personal privacy. The officers spent virtually the entire afternoon sitting in the living room with Mrs. Briddell, waiting for the warrant to arrive. Besides the general invasion of the Briddells' privacy by the officers entering their home, two particular actions did invade the privacy of Mrs. Briddell. However, these actions were justified by the circumstances and their intrusion was minimal under the circumstances.[8] First, ac-

7. The four named defendants had different roles in the seizure of the house. Because I find that the seizure was reasonable with regard to the Briddells and therefore it did not violate their constitutional rights, I do not have to consider the different positions of the defendants in relation to the seizure. Washington is not a plaintiff in this suit and any invasion of her privacy will not be considered in determining the reasonableness of the officer's actions.

8. The Briddells offer a twenty-four item list of ways in which they believe that the defen-

dants failed to properly balance their law enforcement needs with the Briddells' personal privacy. Several of their arguments relate to the search rather than the seizure of their house. Most of the rest simply take issue with a perceived lack of courtesy and respect on the part of the police. They reflect the inevitable tension that develops when a house is seized while the police are waiting for a warrant to search the house for evidence of a serious drug offense. Under these circumstances, the police are going to be cautious in their actions and suspicious in their demean-

cording to Mrs. Briddell, Chester initially told her that she could not use the phone and repeatedly told her that she could not leave her home. However, the record reflects that this prohibition was only for a few minutes when Chester first entered the home. After that, Mrs. Briddell used the phone repeatedly and left the house to speak with her husband. At some point, she also received legal advice that she was free to leave the house. Such a brief prohibition is reasonable in light of the need to secure the house and survey the situation. Second, Chester accompanied Mrs. Briddell to her bedroom and stood in her doorway to observe her while she was lying in bed. While this action on its face seems quite invasive of Mrs. Briddell's privacy, it was necessary to insure the integrity of any evidence in the house. It was Mrs. Briddell's choice to lie down in her bedroom and there was a law enforcement justification for keeping her under observation.

The officers' decision to require Rev. Briddell to remain outside his home, rather than allow him to join his wife inside, was also justified under the circumstances. If additional people were permitted to enter the home while the warrant was being secured, it would have increased the potential for confrontations and the risk of concerted action to destroy evidence. More officers would have been required to enter the home in order to maintain order and monitor the individuals in the house. While it is true that allowing Rev. Briddell to re-enter his home would have been less

restrictive, preventing his re-entry was a reasonable restriction under the circumstances. *See id.* at 335, 121 S.Ct. 946; *see also Segura v. United States,* 468 U.S. 796, 811, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (suggesting that police "stake-out" outside of apartment which prevents entrance while a warrant is obtained would not be an unreasonable seizure under the Fourth Amendment).

2.

■ While there is some dispute as to how long the seizure lasted before the search began, even the longest possible period of seizure was reasonable under the circumstances. Mrs. Briddell testified that Chester and Brown arrived at her house by 12:30 at the earliest and Savage testified that the warrant was signed at 6:00 p.m. at the latest, which means the seizure lasted, at most, five and a half hours.[9] While the seizure in *McArthur* only lasted two hours, a five-and-one-half-hour seizure seems to fit easily within the bounds of what the Supreme Court considers limited and reasonable. *See Segura,* 468 U.S. at 810–12, 104 S.Ct. 3380 (upholding a seizure of nineteen hours while police obtained a warrant to search apartment); *cf. In re Elizabeth G.,* 88 Cal.App.4th 496, 105 Cal.Rptr.2d 811, 817 (2001) (finding seizure that lasted for approximately five and a half hours to be reasonable).

B.

■ The seizure of the Briddells' house removed any exigent circumstances that

---

or. These perceived personal slights do not infringe on the Briddells' privacy interest.

9. The Briddells also argue that it violated their rights for the search to be conducted before the warrant was served on them. However, there is no requirement that a search warrant be served on a person before a search begins. Maryland Rule 4–601(c) requires only that when a search warrant is

executed, the officers leave a copy of the search warrant and inventory with the person whose property is taken or who appears to be in charge of the property. *See also United States v. Bonner,* 808 F.2d 864, 869 (1st Cir. 1986) ("Courts have repeatedly upheld searches conducted by law enforcement officials notified by telephone or radio once the search warrant issued.").

could have justified a warrantless search of the home. Once the officers were present in the house and had all of its occupants under observation, there no longer was a threat that evidence would be destroyed. "Absent exigent circumstances, a warrantless search ... is illegal." *Segura*, 468 U.S. at 810, 104 S.Ct. 3380. Given this, if the search of the Briddells' house began before the search warrant was signed, there was a clear violation of the Briddells' constitutional rights.[10]

Based on the present record, no reasonable jury could find that the officers at the Briddells' house began searching the house before Savage contacted them to inform them that the search warrant had been signed. Savage testified that the judge signed the search warrant between 5:30 and 6:00 p.m. Once it was signed, he contacted the officers at the scene. Savage claims that the search did not begin until he arrived on the scene at approximately 6:10 p.m. Savage Dep. at 13, 16–17. Sav-

age's account is supported by the supplemental report written by Chester on June 16, 2000, Pl.'s Ex. 10 at 2, as well as a supplemental report filed by Officer Kravecz on June 21, 2000, Pl.'s Ex. 12 at 1.

The only testimony offered by the Briddells to support their argument that the search began before the warrant was signed is the testimony of Rev. Briddell. He testified that when he arrived at his house just after 5:00 p.m., the search was already underway. M. Briddell Dep. at 101–03. However, Rev. Briddell did not enter his home. *Id.* at 77. The front door was open approximately a foot and half, but all Rev. Briddell could see when he looked into the house was that there were officers in the hallway.[11] *Id.* at 72. Given Rev. Briddell's lack of personal knowledge of when the search inside his home began, the present record does not support the Briddells' claim of an early search by the officers.[12]

---

**10.** Of the four named defendants, only Chester could be found liable if there was a warrantless search of the Briddells' house. Mrs. Briddell has testified that Brown departed her home prior to any search taking place so he cannot be held liable for any warrantless search. E. Briddell Dep. at 103–07, 116. Purnell's involvement in this incident is limited to a fifteen-minute period when she conducted a strip-search of Washington in the bathroom of the Briddells' house. Even if this did occur prior to the warrant being signed, Purnell's unconstitutional search would violate Washington's rights, not the Briddells'. *See Wong Sun v. United States*, 371 U.S. 471, 492, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The Briddells argue that Savage should be held liable because he was in charge of the operation. However, they cite no authority to support this contention. Nor do they provide any link between Savage and the alleged warrantless search.

**11.** According to his testimony, the only search that Rev. Briddell personally observed prior to the warrant being signed was a search of the Mercedes by a canine unit. *Id.* at 70–73.

A Canine Incident Report of the Wicomico County Sheriff's Office which indicates that the canine unit arrived on the scene and conducted its initial scan of the Mercedes at approximately 5:00 p.m. supports Rev. Briddell's testimony regarding the Mercedes. Pl.'s Ex. 11. Even if this search occurred prior to the search warrant being signed, it would not constitute a violation of the Briddells' rights because the car did not belong to them. *See Wong Sun*, 371 U.S. at 492, 83 S.Ct. 407.

**12.** In addition to the lack of evidentiary support in the record, several other considerations suggest that the search of the Briddells' home did not occur until later than Rev. Briddell claims it did. First, Rev. Briddell observed a number of officers still outside his home when he arrived which would indicate that the search had not yet begun. *Id.* at 70. Second, the canine unit which searched the Mercedes beginning at 5:00 p.m. and later searched the rear bedroom of the Briddells' house remained at the scene until 8:20 p.m. Finally, it is unlikely that the officers who had properly seized the Briddells' house while

### III.

 Chester argues that he is entitled to public official immunity with regard to the state law claims against him, Counts II through VIII.[13] For common law public official immunity to apply:

(1) the actor must be a public official, rather than a mere government employee or agent; (2) the conduct must have occurred while the actor was performing discretionary, as opposed to ministerial, acts; and (3) the actor must have performed the relevant acts within the scope of his official duties. If those three conditions are met, the public official enjoys a qualified immunity in the absence of "malice."

*Baltimore Police Dep't v. Cherkes*, 140 Md. App. 282, 780 A.2d 410, 437 (2001) (quotations and citations omitted). There can be no dispute that all three conditions for public official immunity have been met. *Id.* ("It is clear that policemen are 'public officials' ... and that when they are within the scope of their law enforcement function they are clearly acting in a discretionary capacity.") (citation and quotation omitted).

Furthermore, based on the present record, no reasonable jury could find that Chester acted with malice. "The actual malice needed to defeat official immunity requires an act ... with an evil or rancorous motive influenced by hate, the purpose being to deliberately and wilfully injure the plaintiff." *Williams v. Mayor & City Council of Baltimore*, 359 Md. 101, 753 A.2d 41, 57 n. 16 (2000) (citation and quotation omitted). At most, the record suggests that Chester acted insensitively and with suspicion. *See* E. Briddell Dep. at 125 (describing how Chester thrust his badge in her face, looked around her home in a manner that suggested to her that he believed she had no right to have nice things and spoke to her in a nasty tone). In addition, Mrs. Briddell fails to provide any support for her contention, which could support a claim of malice, that Chester, who is African–American, was motivated by racial animus. *See* E. Briddell Dep. at 226–229 (stating that she believed African–American police officers discriminated against African–Americans because she had heard of such instances on television and read about them in the paper). For these reasons, Chester's motion for summary judgment as to Counts III through VIII will be granted.[14]

### ORDER

For the reasons stated in the accompanying memorandum, it is, this 10th day of June 2002 ORDERED

---

they waited for a search warrant to be prepared and signed, after several hours of waiting, suddenly would begin their search prior to the warrant being signed.

I also note that even if the search began shortly before the warrant was signed as the Briddells contend, they would not be entitled to anything more than nominal damages for this technical violation.

**13.** Chester cannot assert immunity to Count II because it alleges state constitutional violations. *Okwa v. Harper,* 360 Md. 161, 757 A.2d 118, 140 (2000). The violations of Articles 24 and 26 of the Maryland Declaration of Rights that are alleged in Count II are analogous to, and require the same analysis as, the Brid-

dells' claims under the Fourth Amendment in Count I. *Williams v. Prince George's County,* 112 Md.App. 526, 685 A.2d 884, 895 (1996). For this reason, Chester's motion for summary judgment will be granted as to Count II.

**14.** Rather than discussing whether the record supports their contention that Chester acted with malice, the Briddells request leave to amend their complaint if it is found insufficient. However, Chester's current motion is one for summary judgment, not to dismiss. For this reason, the sufficiency of the evidence in the record, not the sufficiency of the pleadings, is at issue. Simply amending the complaint cannot create a factual dispute that precludes summary judgment.

1. The defendants' motions for summary judgment are granted; and

2. Judgment is entered in favor of all defendants against plaintiffs.