Filed 9/3/14  In re Roger D. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| In re ROGER D., JR., et al., Persons Coming Under the Juvenile Court Law. | B253101 |
| | (Los Angeles County Super. Ct. No. CK97483) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent.<br><br>        v.<br><br>ROGER D.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Robert S. Draper, Judge.  Affirmed.

Eliot Lee Grossman, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel for Plaintiff and Respondent.

Roger D. (father) appeals from jurisdictional and dispositional orders of the juvenile court. Father contends that substantial evidence does not support the juvenile court's finding that he sexually abused Jessica R. (born May 1996). Father further argues that substantial evidence does not support the juvenile court's findings that abuse of Jessica put Roger, Jr. (born June 2000) and Valerie (born March 2003), father's biological children, at risk of harm. Finally, father contends he received ineffective assistance of counsel.[1]

## COMBINED FACTUAL AND PROCEDURAL BACKGROUND

The family consists of father, Sandy R. (mother), Jessica (mother's daughter from a previous relationship), Roger, Jr. and Valerie.[2]

**Referral and investigation**

On October 2, 2012, DCFS received a referral alleging that then 16-year-old Jessica was emotionally and sexually abused by father. The caller reported that mother and Jessica sought therapy for Jessica for symptoms of depression. Jessica and mother reported that the main reason Jessica was depressed was that she was raped by father two years earlier when she was age 14. The caller reported that mother had already separated from father due to domestic violence. There was an active restraining order in place for mother against father.

An emergency response social worker visited the home and interviewed Jessica. Jessica reported that on one occasion, father had backhanded her on the left cheek because she was looking at a friend's cellular telephone. Father was upset because Jessica was not allowed to have a cellular telephone.

Jessica further reported that one time, two years prior, father sexually abused her. Jessica did not disclose the abuse to her mother at that time. Jessica reported that father

---

[1]    Father has also raised the ineffective assistance of counsel issue in "a motion to remand for discovery re potential IAC claim and/or petition for writ of habeas corpus" filed concurrently with his opening brief. We denied the motion on March 19, 2014.

[2]    Jessica's biological father's whereabouts are unknown. The family has no contact with him and he is not a party to the case.

woke her and took her to the living room. Mother and siblings were sleeping when the incident took place. Jessica reported that father had intercourse with her, with full penetration, but that it was for a short time because he thought he heard someone.

On December 19, 2012, the social worker transported mother and Jessica to a forensic interview. During the interview, Jessica elaborated on the sexual abuse incident. She stated that she was awakened by father who took her to the living room. She thought he wanted company while watching television. She started feeling like someone was touching her, on her lower private part between her legs and the side of her breast. She was in shock and felt like she was dreaming. Jessica recalled that she was wearing shorts, like "boxers," and a tank top. She felt her shorts being pulled down. Jessica felt father's hands inside her shorts. She thought that father was touching her outside her shorts and tank top. When he pulled her shorts down, father was trying to penetrate her. His sweats were down. His private parts were touching her private parts. Jessica remembered pushing him off.

Jessica did not tell mother right away about this incident. She told mother about one year later, when they were on vacation in Los Angeles and away from father. Mother cried and held her. When they returned to their residence in Riverside, mother confronted father. After that, mother kept all the children away from father.

Jessica reported that it was her idea not to prosecute father. She did not want to re-live the incident as she did in therapy. Father was like a biological father to her, and she felt "back-stabbed." Jessica was happy that father was not around and that she had no contact with him. However, she had no concerns for her siblings' safety and understood that her siblings wanted to see father.

Mother was also interviewed. She reported that though she was not married to father, she had lived with him for 15 years. Mother was afraid of father due to abuse, both verbal and physical, which started when she was 17 years old. Mother reported that father hit her and raped her on one occasion. Mother never called the police. Mother provided the social worker with a copy of the restraining order against father, which did not include the children.

3

When Jessica disclosed the sexual abuse to mother, mother decided that she was going to move out. However, she stayed with father for six months longer in order to save money. During this time mother did not leave the children alone with father. After six months, mother moved in with maternal grandmother for three months and then to her current address in Bell Gardens.

Father was interviewed at the DCFS office. Father denied Jessica's allegations. He reported that he was surprised when he received notice for the court date for the restraining order. He had contact with mother and the children prior to the restraining order. Father showed the social worker text messages from mother and Jessica dated September 2012.

Father reported that he and mother are not married and he has not lived with the family since September 2011. In September 2011 he overdosed on his medication and walked in to his psychiatrists' office in Riverside. He was admitted and placed on an involuntary Welfare & Institutions Code section 5150 hold.[3] When he was released he moved in with paternal grandmother in Carson, where he has lived ever since. Father acknowledged that he is aggressive but denied ever physically abusing mother or the children. He admitted to yelling at them. He also admitted that mother confronted him about Jessica's allegation of sexual abuse. Father told mother it was not true. Father confronted Jessica about the allegation. Jessica denied it, but later told him that he had fondled her. Father stated he would never harm his children and if he did he would remember.

Father reported that in 2005 he was diagnosed with depression, anxiety, psychotic behavior and bipolar disorder. He is taking medication and seeing a psychiatrist in Carson. Father also reported that he has episodes where he goes to sleep in one area and wakes up in another area. When he lived with mother, mother told him he would walk around the house mumbling and laughing.

---

**3**     All further statutory references are to the Welfare & Institutions Code.

Father desired visitation with his children. He loved Jessica as a daughter but understood the visits would not include her. Father said he would continue to respect the restraining order until the court ordered visits.

Paternal grandmother was also interviewed. She had no concerns about father having contact with the children. She was surprised when she learned of the restraining order because mother and the children had been visiting with father at her home. The last time was July 2012 and everyone got along. Father and mother were acting as if they were trying to reconcile.

Both Valerie and Roger, Jr. were interviewed. Both children denied any sexual abuse and both wanted to visit with father. Roger, Jr. reported being physically abused by father, and having witnessed father hit mother, but stated that the abuse last occurred approximately three years ago.

## Section 300 petition and detention

On January 28, 2013, DCFS filed a section 300 petition pursuant to subdivisions (a), (b), (d), and (j) alleging that the children were at risk due to father's physical abuse of Jessica and Roger, Jr., and his sexual abuse of Jessica. On the same date, the juvenile court detained the children from father and released the children to mother. The matter was continued to April 2, 2013, for the adjudication hearing.

## Jurisdiction/disposition and interim reports

A dependency investigator interviewed the family again on March 14, 2013. Jessica restated the sexual abuse allegations but this time she denied that father penetrated her. She said: "It was just like a lot of touching like over my clothes. It was on my lower body. When I started waking, waking up that's when he stopped. I woke up. He was just walking away."

The dependency investigator read Jessica her initial statements to the social worker. Jessica stated, "I didn't know the difference. I asked my mom what the difference was between rape and molestation." Jessica acknowledged telling the social worker that it was rape, but said that after mother explained the difference to her, she realized it was not rape. Jessica also denied being digitally penetrated.

5

When Roger, Jr. was interviewed, he denied ever witnessing or experiencing any physical abuse in the home. He also denied any knowledge of Jessica being sexually abused by father or anyone else. The dependency investigator was unable to interview Valerie because she was at school.

Mother was also interviewed on March 14, 2013. Mother stated that Jessica reported that father hit her once, and she saw father hit Roger, Jr. once when he was little. With respect to the sexual abuse allegations, mother said that father "tried to penetrate. It was mostly molestation, but not rape. He tried to digitally penetrate her with his finger and penis." Mother stated that Jessica disclosed the molestation after she and father separated in 2011. Mother said that she obtained the restraining order later after father threatened and harassed her. Mother disclosed that she was diagnosed with depression and bipolar disorder and was taking medication and receiving treatment for her conditions.

Father continued to deny the allegations. He confirmed that he once hit Jessica in a dispute over a cell phone. He also acknowledged hitting Roger, Jr. once with an open hand by his ear.

DCFS concluded that while it was evident that father had sexually abused Jessica, it was "unclear if [father] forcibly raped the child and/or digitally penetrated her vagina. Jessica's statements to [the social worker], the forensic interview, police and this [investigator] are inconsistent as to being raped or penetrated by [father's] penis and/or finger." The investigator also wrote:

> "It is unclear why Jessica is unable to consistently state what took place when [father] was sexually abusing her. She is able to state that he was touching her, but it is not certain as to him penetrating her or not with his penis and/or finger. She does state that she felt his penis on her vagina. This may be due to her inability to articulate exactly what happened out of her own naivety, fear, or repressed memories."

DCFS recommended that the juvenile court declare the children dependents of the court pursuant to section 300, subdivisions (b), (d), and (j), and offer father reunification services.

In a report dated April 2, 2013, DCFS advised that Jessica's therapy had been terminated due to inconsistent attendance and at mother's and Jessica's request. The therapist reported that mother did not want to deal with the rape, and that Jessica felt guilty and did not want anyone to know about it. Jessica did not want father to go to jail nor did she want her siblings have to see father in jail.

An interim review report was filed on September 4, 2013. DCFS again referenced Jessica's uncertainty as to the details of her sexual abuse. DCFS speculated: "This may be due to her inability to articulate exactly what happened out of her own naivety, fear, and/or feelings of guilt, denial, embarrassment or simply wanting to forget or even being influenced by mother to have this case closed."

**Jurisdictional/dispositional hearing**

The combined jurisdictional/dispositional hearing was conducted on November 20-21, 2013. The court admitted DCFS's reports into evidence. Father's counsel called the dependency investigator as a witness. The investigator admitted that Jessica's statements to various professionals contained inconsistencies. She believed that Jessica was sexually abused, but was unable to articulate exactly what happened.

Father's counsel indicated that he intended to call Jessica as a witness. The court continued the case to the next day. However, on November 21, 2013, father's counsel did not call Jessica as a witness. Instead, he rested and requested that the court proceed to closing arguments.

In argument father's counsel questioned Jessica's credibility given her inconsistent statements. He further argued that even if the court believed Jessica's statements, there was no evidence that her siblings were at risk. Father's counsel asked the court to dismiss the petition in its entirety.

Jessica's counsel asked the court to dismiss the physical abuse allegations and sustain the sexual abuse allegations. However, Jessica wanted to be dismissed from the petition entirely. Roger, Jr. and Valerie's counsel requested that the court dismiss the physical abuse counts and sustain the sexual abuse counts.

7

The juvenile court dismissed the counts in the petition alleging physical abuse and sustained the counts alleging sexual abuse of Jessica. The court stated: "I think that Jessica is credible. I think it's understandable that there would be some variation given the nature of the allegations." The court found that there did not need to be a current risk in order to sustain a petition pursuant to section 300, subdivision (d). The court declared the children dependents of the court and terminated jurisdiction over Jessica. The court removed Roger, Jr. and Valerie from father, maintained them with mother, and ordered DCFS to provide father with family reunification services and mother with family maintenance services.

**Appellate proceedings**

On December 11, 2013, father filed his notice of appeal from the findings and orders of the court on November 21, 2013.

On February 28, 2014, father filed a motion to remand for discovery re potential IAC claim and/or petition for writ of habeas corpus (motion to remand). On the same day, father filed his opening brief.

On March 6, 2014, father filed a supplemental declaration of Eliot Lee Grossman, Esq., in support of motion to remand with exhibits.

On March 14, 2014, DCFS filed an opposition and answer to father's motion to remand.

On March 19, 2014, father filed a second supplemental declaration of Eliot Lee Grossman, Esq., in support of motion to remand.

On March 19, 2014, this court denied father's motion.

On May 20, 2014, father filed his reply brief, which included a request for reconsideration of our denial of his motion to remand. On the same date, father filed a third supplemental declaration of Eliot Lee Grossman, Esq. in support of request for reconsideration of motion to remand.

8

## DISCUSSION

### I. Substantial evidence supports the juvenile court's findings regarding sexual abuse of Jessica

Father's first argument is that the juvenile court's decision to sustain the sexual abuse allegations is not supported by substantial evidence. He argues that no reasonable fact finder could possibly find Jessica's inconsistent and contradictory statements to be credible, especially since even DCFS could not determine the particulars of the alleged abuse.

When reviewing a factual finding for substantial evidence, we do not reweigh the evidence or substitute our judgment for that of the fact finder. (*People v. Escobar* (1996) 45 Cal.App.4th 477, 481.) "We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.) "'"Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]"'" (*People v. Mayberry* (1975) 15 Cal.3d 143, 150.)

Jessica's statements to her therapist and the social worker constitute substantial evidence of the sexual abuse. "The testimony of a single witness is sufficient to uphold a judgment [citation]." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 200.)[4] The juvenile court was entitled to find Jessica's statements to be credible. Furthermore, the juvenile court also considered the testimony of the dependency investigator, who indicated that she had interviewed close to 100 victims of sexual abuse and had encountered victims

---

[4]   Although Jessica did not testify in court, her statements contained in DCFS's reports are "admissible and is sufficient to support a finding that the child is described by section 300." (Cal. Rules of Court, rule 5.684(c).) There is no indication that father objected at any time to the admission of this evidence.

9

whose stories contained inconsistencies. In her opinion, the inconsistencies in Jessica's story were understandable.

"It is not an appellate court's function . . . to redetermine the facts. [Citation.]" (*In re Sheila B., supra*, 19 Cal.App.4th at p. 200.) Father is essentially asking this court to substitute its judgment for that of the juvenile court. We are not permitted to do so. Substantial evidence supports the juvenile court's conclusion that father sexually abused Jessica, therefore the finding must be affirmed.

## II. Substantial evidence supports the juvenile court's findings that Jessica's siblings are at risk of abuse

Father next argues that, even if it is to be assumed that there was sexual abuse of Jessica, the juvenile court's finding that father's biological son and daughter are at risk of abuse is not supported by substantial evidence. Father argues that the juvenile court's finding that Roger, Jr. and Valerie are at substantial risk of sexual abuse is unsupported by any evidence and is the product of mere speculation and conjecture. Father cites *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393 for the proposition that "'*inferences that are the result of mere speculation or conjecture cannot support a finding* [citations].' [Citation.]" (Original italics.) Father argues that there is no evidence that a man who has had sex with a 14-year-old girl would engage in such behavior with his 12-year-old son and nine-year-old daughter.

We have no trouble determining that sufficient evidence supported the juvenile court's determination that Valerie was at substantial risk of harm. Father attempts to differentiate between the two girls by pointing out that Jessica was not his biological child. However, that distinction is not persuasive under the circumstances of this case, where father had taken on a paternal role with Jessica since she was a baby. Father stated, "I've been with [Jessica] since she was three months old so I pretty much raised her." Father also informed the dependency investigators that he and his family loved Jessica as if she were his biological daughter. Father's relationship with Jessica was not distinguishable from his relationship with Valerie, and the juvenile court did not err in

10

determining that then 10-year-old Valerie was at substantial risk of the same type of abuse that Jessica suffered.

The analysis is different as to father's son due to gender. The Supreme Court recently reviewed the cases in which dependency jurisdiction was upheld over children whose siblings had been sexually abused where they were of the opposite gender. The high court held that a father's severe sexual abuse of his own child is sufficient to support dependency jurisdiction over all siblings regardless of gender. (*In re I.J.* (2013) 56 Cal.4th 766, 780 (*I.J.*).)[5]

In *I.J.*, the Supreme Court addressed the issue of whether a father's sexual abuse of his daughter supported a further determination that the father's *sons* were also dependents of the court, where there was no evidence that the father sexually abused the sons and they were unaware of their sister's abuse before the proceeding began. (*I.J., supra*, 56 Cal.4th at p. 770.)

The court noted that "section 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction." (*I.J., supra*, 56 Cal.4th at p. 773.) Instead, it requires only a "substantial risk" that the child will be abused or neglected. (*Ibid.*) The high court focused on subdivision (j) of section 300, which allows a juvenile court to take jurisdiction of a child where (1) the child's sibling has been abused or neglected as defined in specified other subdivisions and (2) there is a substantial risk that the child will be abused or neglected as defined in those subdivisions.

As in the case before us, the first requirement was met as to all of the siblings. The issue was whether the second requirement was met, specifically as to the father's male children. (*I.J., supra*, 56 Cal.4th at p. 774.) In determining that it was, the high court focused on the language of section 300, subdivision (j), which permits the court to consider the circumstances surrounding, and the nature of, the father's sexual abuse of the sibling. The *I.J.* court held that the statute implies that the more egregious the abuse,

---

[5]     The *I.J.* court expressly disapproved two of the cases cited by father in his opening brief: *In re Jordan R.* (2012) 205 Cal.App.4th 11 and *In re Maria R.* (2010) 185 Cal.App.4th 48. (*I.J., supra*, 56 Cal.4th at pp. 780-781.)

the more appropriate for the juvenile court to assume jurisdiction over the siblings. (*Id.* at p. 778.) The Supreme Court found that the court below had appropriately described the father's sexual abuse of his daughter as "'aberrant in the extreme: he sexually abused his own daughter "by fondling the child's vagina and digitally penetrating the child's vagina and forcefully raped the child by placing the father's penis in the child's vagina."'" (*Ibid.*) Jessica's allegations against father are sufficiently similar to warrant the same treatment.

The high court pointed out that another relevant factor in the analysis is "the violation of trust shown by sexually abusing one child while the other children were living in the same home and could easily have learned of or even interrupted the abuse." (*I.J., supra*, 56 Cal.4th at p. 778.) Sexual abuse constitutes "'a fundamental betrayal of the appropriate relationship between the generations . . . [s]uch misparenting is among the specific circumstances which may justify state intervention, including an interruption of parental custody. [Citation.]' [Citation.]" (*Ibid.*) Roger, Jr. was living in the same home as Jessica at the time of father's sexual abuse of Jessica. Roger, Jr. was vulnerable to the type of "misparenting" that the *I.J.* court described, and was therefore at risk of harm.

Father argues that his abuse of Jessica was not "prolonged," as it was found to be in *I.J.* (*I.J., supra*, 56 Cal.4th at p. 778.) In addition, father argues that it is impossible to determine whether the abuse was egregious or not, since it is impossible to determine what actually happened due to Jessica's inconsistencies.

We find these attempts to distinguish *I.J.* to be unpersuasive. It is true that the *I.J.* court found that "[t]he serious and prolonged nature of father's sexual abuse of his daughter under these circumstances supports the juvenile court's finding that the risk of abuse was substantial as to all the children." (*I.J., supra*, 56 Cal.4th at p. 778.) However, the *I.J.* court did not dictate a requirement that sexual abuse be prolonged before the juvenile court is authorized to take jurisdiction over the victim's siblings. Instead, the high court made it clear that the juvenile court must consider "'the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm.'" (*Id.* at p. 774.) "'The provision thus accords the trial court

12

greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.' [Citation.]" (*Ibid.*) Here, while the evidence did not show "prolonged" abuse, it showed the same type of aberrant behavior which the Supreme Court described as a "fundamental betrayal" of the appropriate relationship between father and the children. (*Id*. at p. 778.)

Nor do we agree that father's behavior is indeterminable. The juvenile court sustained the allegations that father "sexually abused the child Jessica, by forcibly raping the child, by placing the . . . father's penis in the child's vagina. The . . . father digitally penetrated the child and fondled the child's vagina and breasts." There is no indication that these allegations were ever amended in light of Jessica's inconsistencies. These sustained allegations describe conduct that is sufficiently egregious to meet the test set forth in *I.J.*

As the Supreme Court pointed out, "'The juvenile court is mandated to focus on "ensur[ing ] the safety, protection, and physical and emotional well-being of children who are at risk" of physical, sexual or emotional abuse. [Citation.]'" (*I.J., supra*, 56 Cal.4th at p. 780.) That is what the court did here in taking jurisdiction of Valerie and Roger, Jr. The court's assumption of jurisdiction does not mean father loses all parental rights. Taking jurisdiction is a means to protect Jessica's siblings, and under the analysis in *I.J.*, the court appropriately did so here.[6]

---

[6] Father argues that due to the absence of evidence of any risk to father's biological children, the juvenile court should have dismissed the petition and litigated the custody and visitation issues in the family law court. In support of this argument, father cites *In re A.G.* (2013) 220 Cal.App.4th 675 (*A.G.*). The *A.G.* court determined that the juvenile court erred in sustaining a section 300 petition where there were no allegations against the father and the father was, and had always been, capable of properly caring for the children. (*Id.* at pp. 683, 686.) The matter before us is distinguishable. Here, there were allegations that father abused the children and that mother had failed to protect the children. In contrast to *A.G.*, the juvenile court maintained jurisdiction over the children and both mother and father were ordered to participate in services.

**III. Father has failed to demonstrate that his trial counsel acted in a manner less than that expected of a reasonably competent attorney**

Father's final argument is that his trial counsel subjected him to ineffective representation by his failure to obtain the videotape of Jessica's forensic interview; failure to obtain the social worker's original notes of Jessica's forensic interview; failure to call the social worker, Jessica, or mother to testify as witnesses during the jurisdiction/disposition hearing; and by his "ineptly-executed" cross-examination of the dependency investigator.

**A. *Applicable law and standard of review***

All parties who are represented by counsel in dependency proceedings are entitled to competent counsel. (§ 317.5, subd. (a).) In order to prevail on a claim of ineffective assistance of counsel, a parent must establish: (1) that his counsel failed to act in a manner to be expected of a reasonably competent attorney practicing in the field of juvenile dependency law; and (2) that the claimed error was prejudicial. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1667-1668.) To meet this second requirement, the parent must show "that it is 'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.]" (*Id*. at p. 1668.) In other words, the parent must show "'"a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1711.)

There is a strong presumption that counsel's conduct was within the wide range of reasonable assistance. (*In re Elizabeth G.* (2001) 88 Cal.App.4th 496, 503.) In particular, "if trial counsel's omissions stemmed from an informed tactical choice that a reasonably competent attorney might make, the conviction must be affirmed. [Citations.]" (*Ibid*.)

**B. *Father's arguments***

Father argues that, by failing to call Jessica as a witness at the hearing, father's counsel forfeited the opportunity to subject her conflicting statements to adversarial testing. Father further argues that this could not have been a tactical decision since his trial counsel never obtained nor reviewed the tape of Jessica's forensic interview or the

14

original notes of the social worker who observed the interview. Similarly, father argues, it could not have been a tactical decision not to call the social worker who observed the interview.

Further, father claims his counsel's cross-examination of the dependency investigator fell below the level of reasonable competence because counsel failed to press the investigator on Jessica's statement that she was not concerned about the safety of her siblings in father's care, and on her previous statement that due to Jessica's conflicting versions, DCFS could not determine what actually occurred during the sexual abuse incident.

We discuss father's assertions of incompetence below.

*C. Father has not shown conduct falling below that which is to be expected of a reasonably competent attorney*

**1. Failure to obtain video and notes of forensic interview**

The evidence provided by father in support of his motion to remand shows that father's trial counsel's failure to obtain the forensic interview of Jessica was a strategic decision. According to the email from father's counsel's office dated March 4, 2014, father's counsel "felt that the myriad of inconsistencies in the various reports would be the best avenue to argue that the abuse didn't occur." Father's counsel was aware of the contents of the forensic interview given that it was summarized in the detention report. After Jessica changed the details of her story, the social worker formally reported that it was now "'unclear what the sexual abuse consisted of.'" Father's counsel felt that DCFS's admission as to the uncertainty of Jessica's story was the best way to show how her story changed over time. If father's counsel requested the copy of the forensic interview and notes, he risked revealing to DCFS and the court that the statements were not as inconsistent as DCFS reported. From a strategic standpoint, father's counsel could have reasonably believed that DCFS's admission of the inconsistencies in Jessica's story was the strongest evidence of such inconsistencies. Father's counsel explained in a declaration dated March 17, 2014, that he did not want to make the video of the forensic interview "the subject of discovery and risk the possibility the Court may find her to be a

sympathetic and credible victim based on her appearance and demeanor in that interview."

### 2. Failure to call Jessica as a witness

The email from father's counsel provided in support of father's motion to remand also addressed father's counsel's decision not to call Jessica as a witness at the jurisdiction/disposition hearing. Again, it shows a strategic decision not to call her. Father's counsel was concerned that by calling the minor, he would be giving her the chance to rehabilitate her story. He did not want to "give her the opportunity to straighten out her prior wildly inconsistent statements." In addition, father's counsel though that Jessica would be a sympathetic witness. Father's counsel noted a tendency for a sympathetic attitude towards children in the juvenile court. Father's counsel explained that calling Jessica to elicit even more inconsistencies was unnecessary and would "only create an opportunity for County Counsel and Minor's Counsel to rehabilitate these inconsistencies and give her the credibility she was lacking in the reports alone." Father's counsel indicated that if the court and county counsel were not going to give Jessica the chance to straighten out her stories, "he wasn't going to do it for them."

### 3. Failure to call original social worker on the case

Father argues that his counsel should have called the original social worker in the case to expose any inconsistencies between her notes from Jessica's forensic interview and the interview itself. However, father is only speculating that any such inconsistencies exist. Again, father's counsel could well have concluded that the social worker's testimony may have helped resolve the inconsistencies, bolster Jessica's story, and generate more sympathy for the child. The reports provided by DCFS acknowledged inconsistencies in Jessica's story. Father's counsel could well have determined that it would be detrimental to father's case to call another social worker who believed Jessica and might serve to convince the court of the veracity of Jessica's allegations.

16

#### 4. **Failure to call mother as a witness**

Father argues that father's counsel should have called mother as a witness because she could have been cross-examined about a number of inconsistent statements she made to DCFS and to support a theory that Jessica's allegations came as a result of mother and father's contentious relationship. Again, we find that father's counsel's decision not to call mother was likely strategic. Mother could have provided persuasive testimony that the allegations were not the result of any friction between her and father. Furthermore, mother would likely have provided persuasive testimony of her belief in the veracity of Jessica's accusation. From father's counsel's perspective, he likely did not want another witness who was sympathetic to Jessica and who would serve to bolster Jessica's credibility.

#### 5. **Trial counsel's cross-examination of the dependency investigator**

Finally, father argues that his trial counsel's cross-examination of the dependency investigator (DI Flores) fell below the standard of care for a reasonably competent attorney. Father claims his counsel failed to impeach DI Flores on two critical points: first, her comment that she could not recall whether or not Jessica expressed concern for her younger siblings; and second, her statement that she had previously testified that it was her opinion that father raped Jessica, when in fact DI Flores had revealed in the jurisdiction/disposition report that, due to the inconsistencies in Jessica's statements, she could not determine exactly what happened during the sexual abuse incident.

Again, these omissions could well have been tactical decisions. Certainly Jessica's statement that she had no concerns for her siblings could have cut both ways: while it could suggest that the accusations were false, it could also show that Jessica's sympathy for her siblings, and their relationship with their father, was an overriding concern for Jessica. There was ample evidence that Jessica felt guilty reporting father's conduct. She did not want to pursue criminal charges against father; she did not want her siblings to have to see their father in jail; her therapist reported that mother did not want to deal with the rape and Jessica felt guilty and did not want anyone to know about it. These facts reveal Jessica's conflicting emotions. A line of questioning which

17

highlighted Jessica's concern for her siblings could have garnered more sympathy for her as a confused victim, and produced results damaging to father's case.

In addition, Jessica's internal conflicts about reporting the abuse, and in particular her sympathy for her half-siblings -- father's biological children -- could help to explain why she changed her story over time, making the allegations less severe. Trial counsel may not have wanted to open the door to reveal Jessica's concern for her siblings and thereby help explain Jessica's inconsistencies. For this reason, trial counsel's failure to pursue this avenue of questioning did not fall below the standard of care for a reasonably competent attorney.

Nor did trial counsel's failure to attempt to pin down DI Flores regarding her statement that she previously testified that it was her opinion that father raped Jessica fall below the relevant standard of care. Whether or not DI Flores previously expressed her opinion, it was a powerful opinion for the court to consider given DI Flores's close contact with the family. Once DI Flores gave her opinion, it was a perfectly appropriate reaction for father's counsel to move on and not emphasize that opinion or give DI Flores the opportunity to reiterate it.

### D. Father has not shown a reasonable probability of a more favorable outcome

Father has failed to establish that any of father's trial counsel's tactical decisions fell below the relevant standard of care. In addition, father has failed to show prejudice.

It was already known that there were inconsistencies in Jessica's description of father's alleged abuse. Obtaining her forensic interview and calling her as a witness was not likely to reveal even more inconsistencies. On the contrary, it was more likely that the video, and Jessica herself, would garner sympathy and might even help to explain the inconsistencies. In short, father has not made a showing that, in the absence of these tactical decisions, he would have achieved a better outcome.

Further, father has not shown that examining the social worker, or mother, or further pressing DI Flores on certain points, would have led to a more favorable result. As set forth above, father's counsel's tactical decisions during trial were sound. There

18

was ample reason to fear that going down these paths of questioning would have elicited damaging testimony.

In sum, the record reveals that father's trial counsel made sound strategic decisions, and father received competent representation.

Father's request for reconsideration of our denial of his motion to remand, contained in father's reply brief, is denied.

**DISPOSITION**

The orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ


We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST